Robert B. KEMP, Appellant
(Respondent Below),

v.

Suzanne D. KEMP (Durham), Appellee
(Petitioner Below).

No. 2–1283–A–476.

Court of Appeals of Indiana,
Second District.

Nov. 26, 1985.

Molly R. Rucker, Indianapolis, for appellant.

J. William DuMond, Indianapolis, for appellee.

SULLIVAN, Judge.

Robert Kemp appeals from a decree of the Marion County Superior Court dissolving his marriage with Suzanne Kemp, dividing their property pursuant to a prenuptial agreement, and granting Suzanne the right to name the custodian of custodial accounts given by Robert under Indiana's Uniform Gifts to Minors Act[1] to Suzanne's children by a previous marriage.

On appeal, Robert presents three issues:

(1) Whether, after determining that Suzanne's daughters' custodial accounts were *not* marital assets, the trial court had authority to grant Suzanne the right to name the custodian for those accounts.

(2) Whether the trial court erred when it did not award to Robert an amount equal to dividend and interest income received from his prenuptial assets listed in the parties' prenuptial agreement.

(3) Whether the trial court erred when it did not award to Robert an amount equal to the appreciation of his down payment on the marital residence, which down payment was made from his pre-marital assets.

We affirm.

## I.

### CUSTODIAL ACCOUNTS

Robert contends that once the trial court decided that certain "custodial accounts" were not part of the marital estate, it thereafter lost all authority to enter orders with respect to those accounts. Robert cites I.C. 31-1-11.5-2(d)'s definition of "property" as "the assets of either party or both parties," and I.C. 31-1-11.5-11, which permits the division and distribution of "the property of the parties," to support his contention that the trial court did not possess the requisite authority to award property not owned by the parties or to distribute assets in excess of the marital estate.

■ Robert's argument is not persuasive.[2] First, I.C. 31-1-11.5-1(b) (Burns Code Ed.Supp.1985) states that one of "the underlying purposes and policies of this chapter" is "to provide for the disposition of property, child support and child custody." While I.C. 31-1-11.5-2(c) defines "child" as "a child or children of both parties to the marriage," on its face the statute contemplates that certain aspects of children's rights may inevitably be affected

1. I.C. 30-2-8-1 *et seq.* (Burns Code Ed.Supp. 1985).

2. Robert cites *Geberin v. Geberin* (1977) 172 Ind.App. 255, 360 N.E.2d 41; *Savage v. Savage* (1978) 176 Ind.App. 89, 374 N.E.2d 536; *Gower v. Gower* (1981) 1st Dist.Ind.App., 427 N.E.2d 703, as well as cases from other jurisdictions to

support these propositions. However, because we hold the trial court in this case did not distribute or award any property not owned by the parties, did not distribute assets in excess of the marital estate, and did not award part of the marital estate to the children, Robert's authorities are distinguishable.

by a determination of their parents' legal obligations pursuant to a dissolution proceeding. Indeed, inherent in the concept of "child custody" is the right and obligation to care for, control, and maintain the child. *See,* I.C. 31–1–11.5–21(b) (Burns Code Ed. Supp.1985); *see also Lord v. Lord* (1982) 4th Dist.Ind.App., 443 N.E.2d 847 at 848 n. 1. It is a matter of common sense, then, that in the process of determining which parent acquires or retains custody of a child, a court necessarily grants to that parent some degree of control over the child's property.

For example, no one would deny a "divorce" court's jurisdiction when dissolving a marriage and disposing of marital property to order a husband to surrender to his former wife a motorcycle belonging to their sixteen-year-old child, now in the wife's custody. An argument that the court in such a hypothetical has thereby "awarded property not owned by the parties" or "distributed assets in excess of the marital estate" misses the mark entirely. In fact, such a court has awarded nothing and distributed nothing. It has simply decided which parent should exercise the guidance and control over the minor's life and property that inhere in the concept of parental custody. Before and after the dissolution the motorcycle "belongs" to the child; the court has merely determined which party ultimately possesses what might be termed parental dominion over the property by virtue of having custody of its owner. Thus, even though the mother might subsequently deny her minor child the use of his motorcycle, her right to do so lies in her rights and duties as custodial parent, not in any rights of legal ownership. *See McKinnon v. First National Bank of Pensacola* (1919) 77 Fla. 777, 82 So. 748.[3]

So too, in the present case, even though the trial court was not technically confronted with a child custody or support question,[4] because the parties joined their two families together, whereby each parent assumed de facto responsibilities for the other's children, it was inevitable that in dissolving the marriage the trial court should to some extent redefine the parties' rights and duties with respect to each others' children. This was all that the trial court did, nothing more. While we agree with Robert that the statute does not allow for the payment of child support by him for Suzanne's children, *see R.D.S. v. S.L.S.* (1980) 2d Dist.Ind.App., 402 N.E.2d 30, or the award of non-marital property to Suzanne, we simply cannot accept the proposition that as an incident to a dissolution proceeding a trial court may not interdict the exercise of any parental authority a stepfather may once have enjoyed over his wife's children or their property. The statutory grant of jurisdiction, e.g., to dissolve a marriage, implies the necessary and usual incidental powers essential to effectuate that dissolution, "even though the court may thus be called upon to decide matters which would not be within its cognizance as original causes of action." *Holaway v. Realty Associates* (1961) 90 Ariz. 289, 367 P.2d 643, 647.

The nature of the custodial accounts, as well, indicates that the trial court did not exceed its authority by distributing or awarding property in excess of the marital

---

**3.** In *McKinnon,* the Florida Supreme Court noted that while a father had given money to his children as an absolute gift, he

"did not intend for them to acquire extravagant habits by permitting them to use the money as they pleased before they were eighteen years old. *This, as their natural guardian, he had the right to do,* and if the gifts had been made by a third person he could have controlled his children in its expenditure until they reached an age when he considered it was advisable for them to use it as they saw fit." 82 So. at 749, 750 (emphasis supplied).

**4.** The record indicates that no children were born to Robert and Suzanne's marriage; however, in light of the explicit purpose of Indiana's Dissolution of Marriage Act, we see no reason why the preceding analogy is not applicable where the child is the mother's by a prior marriage. The purpose of such legislation is, after all, to make reasonable provision for the parties and their children during and after the dissolution, *see* I.C. 31–1–11.5–1(b)(2)–(5) (Burns Code Ed.Supp.1985), I.C. 31–1–11.5–12 (Burns Code Ed.Supp.1985), and I.C. 31–1–11.5–10 (Burns Code Ed.Repl.1980), in order to mitigate the potential harm to the parties and their children caused by the dissolution.

estate. First, the record clearly indicates that the funds in Suzanne's daughters' accounts were gifts to them during the marriage, made under the Indiana Uniform Gifts to Minors Act. An examination of that Act reveals that "a gift made in a manner prescribed in this chapter is irrevocable and conveys to the minor indefeasibly vested legal title to the security of money...." I.C. 30–2–8–3. It strains credulity to assert that by deciding Robert had given the funds to Suzanne's daughters under the Act and that he had no valid claim against those funds,[5] the trial court thereby made a property award to the children. After the trial court dispensed with Robert's claims of reimbursement, the clear language of I.C. 30–2–8–3(a) settled as a matter of law ownership of the custodial accounts. No distribution or award occurred.

Of significance, with respect to granting Suzanne the right to name the accounts' custodian, is the fact that contrary to his fiduciary duties under the Uniform Gifts to Minors Act, Robert, while still custodian for Suzanne's daughters' accounts, transferred those funds to Maryland, where his exceedingly accommodating sister was named as successor custodian. He then appropriated those funds from her as reimbursement for expenses he gratuitously incurred on behalf of Suzanne's daughters. The incompatibility of such behavior with Robert's former role as custodian and de facto parent dramatizes the need for the trial court to have resolved this issue.

■ In addition, I.C. 30–2–8–7(a) (Burns Code Ed.Supp.1985) states that "only an adult member of the minor's family, a guardian of the minor, or a trust company is eligible to become a successor custodian," while I.C. 30–2–8–7(d) (Burns Code Ed.Supp.1985) states that "if the person designated as custodian is not eligible, renounces or dies before the minor attains the age of eighteen years, the guardian of the minor shall be successor custodian." When Robert named his sister as successor custodian, he effectively resigned his position. In turn, because his sister was not a member of the minors' family and not their guardian, she too was statutorily ineligible to act as custodian. See I.C. 30–2–8–7(d). To make matters worse, because of his divorce from Suzanne, not only had Robert transferred the accounts to an unqualified successor custodian who lived hundreds of miles away from the minors and then appropriated the funds as his own, at trial he also betrayed a telling recalcitrance as to the designation of a local custodian who could better look after the needs of Brooke and Julie.[6]

Under the circumstances, it was essential that the trial court provide for the designation of a responsible custodian. Indeed, I.C. 30–2–8–7(c) (Burns Code Ed.Supp.1985) virtually compelled the result reached below—the naming of the girls' guardian, Suzanne, as the new custodian for the funds. If a "divorce court" does not possess authority to decide an issue so inextricably tied to a dissolution proceeding and the parent-child relationship, it is difficult to discern what court would. The decision of the trial court with regard to the custodial accounts was eminently correct.

---

5. The trial court expressly rejected a claim by Robert against the custodial accounts as reimbursement for ordinary living expenses provided to Suzanne's daughters. This ruling is not an issue upon appeal.

6. The following exchange between Robert and Suzanne's attorney is illustrative:

"Q. Do you have any objection to Ms. Durham (Suzanne) being the custodian of those accounts?
A. Yes, I do.
*  *  *  *  *  *
Q. Well, would you have any objection to setting up your former employer, Merchants National Bank as custodian for these funds?
A. Oh, yes, I would. I've got all kinds of feelings about that one.
Q. Do you have any objection to Ms. Durham's father becoming the custodian of these accounts?
A. Yes, I do.
*  *  *  *  *  *
Q. Is there some financial institution in the City of Indianapolis that you would trust to make the custodian of these monies for Julian [sic] and Brook Alfred [sic]? To see that it's used for their benefit?
*  *  *  *  *  *
A. No, not off-hand." Record at pages 693–695.

## II.

### DIVIDEND AND INTEREST INCOME

Robert contends that the trial court erred when it did not award him an amount equal to the dividend and interest income derived from his premarital assets listed in the parties' prenuptial agreement. That agreement stated, in pertinent part:

"Should the marriage contract be terminated by legal proceedings, neither party shall have or make any claim to any asset of the other party listed on the attached Schedules I and II which are made a part hereof, *nor to any accessions to, increments in or proceeds derived from any scheduled asset.* In the event any scheduled asset is converted to other property or cash so that the source can clearly be traced, then the replacement, proceeds and/or cash shall also be free from the claim of the other party ...*"* (emphasis supplied).

Specifically, Robert contends that the terms "accessions to, increments in or proceeds derived from" encompass income in the form of dividends and interest.[7]

Suzanne, on the other hand, contends that such terms should be given their common meaning in ordinary English and should be read therefore to exclude income in the form of dividends and interest. In addition, Suzanne points out that the parties explicitly decided to pool their incomes and not to segregate the interest and dividends derived from their pre-marital assets. Finally, Suzanne notes, and the trial court found, that the parties did in fact continuously pool and commingle the dividend and interest income from their pre-marital assets with marital income from other sources. Under such circumstances, Suzanne contends, the trial court did not err in refusing to award Robert an amount equal to the dividend and interest income from his pre-marital assets. We agree.

First, we hold that the prenuptial agreement's three key terms—"accessions," "increments," and "proceeds"— were intended by both parties to entail increases in the initial value of the particular assets listed on the prenuptial schedule. Under this construction, unrealized income in the form of capital gains would be distributed as part of the pre-marital asset. To the extent that realized income in the form of dividends was reinvested through a dividend reinvestment program, such funds would also follow the underlying pre-marital asset. Similarly, interest income from a pre-marital bank account which was allowed to compound or accumulate in that account would also follow the underlying principal to its pre-marital owner. Finally, to the degree that either party could show that realized income in the form of dividends or interest from bank accounts or bonds was segregated as part of a pool of pre-marital funds, apart from other marital income, such discrete funds would also follow the pre-marital asset which spawned them. However, property which is separate at its inception may lose its separate characteristic if it is not kept segregated. *See Klingberg v. Klingberg* (1979) 68 Ill. App.3d 513, 25 Ill.Dec. 246, 386 N.E.2d 517. Specifically, money brought into a marriage as separate property becomes marital property when placed in a joint bank account with the other spouse. *Id.*

In the present case, the trial court specifically found that:

"Respondent continuously commingled dividends and interest earnings from pre-

7. Robert cites the Black's Law Dictionary definitions of those terms. The fifth edition defines them as follows:

"*Accession.* Coming into possession of a right or office; increase; augmentation; addition."
"*Increment.* An increasing in quantity, number, value, etc. That which is gained or added; the act or process of increasing, augmenting, or growing; enlargement, that which is added; increase; opposed to decrement."
"*Proceeds.* Issues; income; yield; receipts; produce; money or articles or other thing of value arising or obtained by the sale of property; the sum, amount, or value of property sold or converted into money or into other property...." BLACK'S LAW DICTIONARY 13, 690, 1084 (5th ed. 1979).
Robert also quotes the definitions of "dividend" and "interest" and cites section 71 of the Internal Revenue Code of 1954 as providing for the inclusion of dividends and interest in "income."

marital assets with the joint income and funds on hand in the parties' joint checking accounts. He also commingled such earnings and proceeds with income and funds on hand from his investment business known as Southwest Investment Trust Management, and R.B. Kemp and Associates. Such dividends, interest, and cash proceeds from pre-marital assets were also continuously commingled with dividend and interest earnings from marital assets as well as the proceeds from the sale of marital assets." Record at 262.

Under such circumstances, the income spun off Robert's pre-marital assets was so dissociated from those assets as to cease to be part of his separate property under the terms of the prenuptial agreement.

Our construction of the agreement is supported by the fact that the second sentence in the contract provision states, "In the event any scheduled asset is converted to other property or cash so that the source can be clearly traced, then the replacement, proceeds and/or cash shall also be free from the claim of the other party...." The word "proceeds" in this portion of the agreement, thus, can reasonably be understood to refer not to dividend and interest income already received, but to funds derived from the ultimate sale of the underlying asset, representing both the original corpus of the investment and any appreciation in its value.

Furthermore, the requirement that the "proceeds" be clearly traceable also indicates that the parties intended that the agreement apply to discrete pre-marital assets which were not voluntarily contributed to the "marital pot." By introducing his dividend and interest income into the parties' joint accounts, Robert evidenced his intent that such income be treated as marital property.

### III.

### APPRECIATION OF REAL ESTATE DOWN PAYMENT

Finally, Robert contends that the trial court erred when it did not award to him an amount equal to the appreciation of his down payment on the marital residence, which down payment was made from Robert's pre-marital assets.

The trial court held:

"The present residence at 11 Hamp Court, Carmel, Indiana, had a down payment of Twenty-two Thousand Seven Hundred Twenty-five and 53/100 Dollars ($22,725.53) made from Respondent's pre-marital assets and the balance of the appreciation is attributable to a variety of factors, including the physical and financial efforts and contributions of both parties and thus a portion of the equity in said property is subject to the claims of both parties." Record at 262.

Robert points out that at the date of separation, the marital residence was worth $110,000, with a mortgage of approximately $50,000, resulting in an equity of $60,000. Robert contends that pursuant to the parties' prenuptial agreement he was entitled to the entire equity of the house, which he says represents his down payment plus the appreciation entirely attributable thereto.

While acknowledging Robert's right to the down payment, Suzanne argues that together the parties expended marital income to make mortgage payments amounting to over $24,000, and that some appreciation was due to Suzanne's efforts at maintaining and improving the property through landscaping and redecorating. Suzanne accepts the trial court's acknowledgment that *some* of the appreciation of the house was due to Robert's down payment. The question before this court on appeal, therefore, is whether the trial court abused its discretion by not allocating a greater portion of the appreciation of the marital residence to Robert.

█ Once again, we are compelled to uphold the trial court's decision.

"It is well-settled law in Indiana that the trial court has broad discretionary power in determining the amount of property settlements. (Citations omitted.) On re-

view, the court examines the division only for an abuse of discretion. The trial court will be reversed only where the result reached is clearly against the logic and effect of the facts and circumstances before the court, including the reasonable inferences to be drawn therefrom. (Citations omitted.)" *Taylor v. Taylor* (1982) Ind., 436 N.E.2d 56, 58.

In light of the nature of the property at issue and the prenuptial agreement's requirement that the pre-marital asset be able to "be clearly traced," we cannot say that the trial court erred in its allocation of the appreciation of the marital residence.

The judgment is affirmed, and the trial court is directed to order the current trustee of the custodial accounts to release those accounts to the appellee as custodian for her daughters Brooke and Julie. Costs of this appeal are to be borne by appellant.

BUCHANAN, C.J., and SHIELDS, J., concur.