**Beulah RYAN, Appellant–Petitioner,**

v.

**John RYAN, Appellee–Respondent.**

**No. 10A04–9503–CV–82.**

Court of Appeals of Indiana.

Dec. 27, 1995.

Transfer Denied May 17, 1996.

Dennis R. Tackett, Tackett, Taurman & Sonne, New Albany, for appellant.

Linda B. Lorch, Lorch & Naville, New Albany, for appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellant–Petitioner Beulah Ryan appeals a marriage dissolution decree challenging the trial court's determination that the antenuptial agreement was valid and the court's divi-sion of the marital estate in accordance with the antenuptial agreement.

We affirm.

### ISSUES

Beulah raises two restated issues for our review:

1. Did the trial court err by deciding that the antenuptial agreement was valid and enforceable?

2. Did the trial court err by determining that the language of the antenuptial agreement was broad enough to encompass a waiver of either party's claim to the other's pension benefits?

### FACTS AND PROCEDURAL HISTORY

John Ryan (John) and Beulah Dalby (Beulah) were married on October 23, 1971. At the time of their marriage, John was 43 years old; Beulah was 34 years old. Both parties were employed. Both John and Beulah had been married and divorced, and each had children from their former marriages. At the time of this marriage, John had assets worth approximately $15,000.00, including a house with a mortgage; Beulah had cash and stock assets of approximately $22,000.00.

One day prior to their marriage, John and Beulah met at Attorney Nicholas Leist's office regarding the preparation of an antenuptial agreement. Neither party had used Leist's services previously, and this was their only meeting with him. According to the testimony of the parties, Beulah told John that she would not see him anymore unless they got married, and John refused to get married without the agreement.

During the meeting, Liest explained to John and Beulah the different clauses which could be included in an antenuptial agreement. Liest asked John and Beulah about the nature of their assets and whether they wanted only the property they currently owned to remain separate or if they wanted the property they acquired during their marriage to remain separate. After the discussion, Liest's secretary typed the agreement while John and Beulah waited. When she was finished, the couple read the agreement and signed it in Liest's presence.

On June 23, 1992, Beulah petitioned for dissolution of the marriage. John filed a counter-petition and pled the existence of the antenuptial agreement alleging the agreement controlled the disposition of the parties' property.

On July 27, 1993, the trial court held an evidentiary hearing on the validity of the antenuptial agreement, which the court found to be valid on August 2, 1993.

In August 16, 1993, the trial court held a final hearing on John's counter-petition for dissolution. The order dissolving John and Beulah's marriage was filed on August 16, 1993.

Finally, after a change of judge, on June 30 and August 12, 1994, the court heard argument regarding the division of property. Prior to the introduction of evidence, Beulah requested that the court enter findings of fact and conclusions of law. On November 4, 1994, the trial court entered its order which states, in pertinent part:

3. The validity of [the antenuptial] agreement has previously been ruled upon by this Court. On August 2, 1993[,] Special Judge Robert Bennett found the agreement to be valid and enforceable as written. That order is the law of this case.

4. The parties throughout their marriage kept most of their property separate and divided the household expenses between them even though John Ryan's earnings were greater than Beulah Ryan's earnings. This practice, while peculiar, is consistent with the relationship of the parties established in the Antenuptial Agreement of October 22, 1971.

5. The only property held in joint name by the parties are four cemetery lots at Kraft–Graceland Memorial Park (which have a value of $2,400.00) and mineral rights in certain real estate identified at trial as the Hebron Church Road farm which are held as tenants in common.

\* \* \* \* \* \*

7. Since John Ryan has a considerably greater estate than Beulah Ryan, the cemetery lots should become the sole property of Beulah Ryan.

\* \* \* \* \* \*

IT IS THEREFORE CONSIDERED, ORDERED AND ADJUDGED by the Court that Beulah Ryan shall have as her sole property the four cemetery lots at Kraft–Graceland Memorial Park.

IT IS FURTHER CONSIDERED, ORDERED AND ADJUDGED by the Court that each party shall have as her or his sole property the tangible personal property now in her or his possession.

IT IS FURTHER CONSIDERED, ORDERED AND ADJUDGED by the Court that all property in the name of either property [sic] shall remain the sole property of that person.

(R. at 423–24)

Beulah appeals.

## DISCUSSION AND DECISION

 In a case in which the trial court has been requested to make findings of fact and conclusions of law, we do not set aside the court's judgment unless the judgment is clearly erroneous. *Rose Acre Farms, Inc. v. Greemann Real Estate* (1987), Ind.App., 516 N.E.2d 1095, 1097, *reh'g denied, trans. denied.* A judgment is clearly erroneous when it is unsupported by the findings of fact and conclusions of law entered on the findings. Findings of fact are clearly erroneous when the record lacks any facts or reasonable inferences to support them. *Donavan v. Ivy Knoll Apartments Partnership* (1989), Ind. App., 537 N.E.2d 47, 50. In determining whether the findings and judgment are clearly erroneous, we will neither reweigh the evidence nor judge witness credibility, but we will consider only the evidence and reasonable inferences therefrom which support the judgment. *Agrarian Grain Co. v. Meeker* (1988), Ind.App., 526 N.E.2d 1189, 1191. A judgment is contrary to law if it is contrary to the trial court's special findings. *Id.*

### I.

Beulah contends that the evidence clearly establishes that the antenuptial agreement is invalid for three reasons:

1. "The Agreement was made one day prior to marriage, with little or no disclo-

sure of assets, and without opportunity for Beulah to seek legal assistance or advice."

2. "The Antenuptial Agreement cannot be considered valid, given the actions of the parties during the marriage."

3. "The evidence clearly establishes that the Antenuptial Agreement could not be enforced as valid, given its unconscionable circumstances and results."

Appellant's Brief at 34.

■ "Antenuptial agreements are to be construed according to principles applicable to the construction of contracts generally." *Rose v. Rose* (1988), Ind.App., 526 N.E.2d 231, 236, *trans. denied.* To interpret a contract, a court first considers the parties' intent as expressed in the language of the contract. *DeHaan v. DeHaan* (1991), Ind. App., 572 N.E.2d 1315, 1320, *reh'g denied, trans. denied* (1992); *City of Evansville v. Old State Util. Corp.* (1990), Ind.App., 550 N.E.2d 1339, 1342. The court must read all of the contractual provisions as a whole to accept an interpretation which harmonizes the contract's words and phrases and gives effect to the parties' intentions as established at the time they entered the contract. *Washington Nat'l Corp. v. Sears, Roebuck & Co.* (1985), Ind.App., 474 N.E.2d 116, 121, *reh'g denied, trans. denied.*

■ Beulah asserts that "it is clear [from the case law] that for an Antenuptial Agreement to be valid, the court must look to the circumstances leading to its execution, and must consider whether the Agreement was read, discussed and understood in its entirety. It is abundantly clear that applying current law, the Antenuptial Agreement in this case is not valid." Appellant's Brief at 36. However, Beulah relies heavily on her own testimony, and our standard of review requires that we look to evidence which supports the judgment of the trial court.

The uncontroverted evidence reveals that John and Beulah discussed and decided that an antenuptial agreement was necessary before they married. Towards that end, the parties met at Leist's office a day before their marriage. Neither party had met Leist before; Beulah selected him from the telephone directory. After some discussion with

Leist, John and Beulah signed the agreement in Leist's presence. The agreement identified the nature of the parties' assets and states that the parties have informed each other of their assets. Neither party spoke with the attorney outside the other's presence. John paid the attorney and both parties were given copies of the agreement.

In addition, John testified that during the meeting, Leist explained to them the different clauses that could be included in an antenuptial agreement. The attorney asked them the nature of their assets and whether they wanted only the property they currently owned to remain separate, or if they wanted the property they acquired during the marriage to remain separate. After the discussion, Leist's secretary typed the agreement for John and Beulah to sign. There is no evidence that either party was compelled or coerced to sign the agreement, or that John had unduly influenced Beulah or used his superior position to convince her to sign the agreement. *See Womack v. Womack* (1993), Ind., 622 N.E.2d 481, 482 (no presumption of undue influence because of the relationship of husband and wife) *and Matuga v. Matuga* (1992), Ind.App., 600 N.E.2d 138, 141, *trans. denied* (time constraints and pressures before wedding do not give rise to an inference of undue influence). Although Beulah's recollections of the meeting with Leist is quite different from John's, and Beulah now asserts that she did not understand the terms of the agreement, the trial court could properly rely on the evidence before it to support the validity of the agreement.

■ Beulah also contends that the agreement cannot be considered valid, given the actions of the parties during marriage, relying on *Kemp v. Kemp* (1985), Ind.App., 485 N.E.2d 663, in which we held that "property which is separate at its inception may lose its separate characteristic if it is not kept segregated." *Id.* at 667. Contrary to Beulah's assertions, the record reveals that throughout the marriage the parties kept their assets separated. Both Beulah and John owned real estate in their own names. John owned real estate in his and his son's name as joint tenants of which Beulah was aware. When John and Beulah purchased real estate to-

gether, they held it as tenants in common, not as joint tenants. Each party maintained separate bank accounts; neither could deposit or withdraw funds of the other, nor did they have knowledge of the exact amount or value of each other's assets. During the marriage, John and Beulah loaned each other money and paid these loans back with interest. In addition, the parties kept scrupulous track of their monthly expenses in order to evenly divide these expenses at the end of the month. Thus, there is sufficient evidence that the character of the parties' separate property did not change its separate characteristic through commingling during the marriage.

■■■■ Beulah next argues that the agreement "could not be enforced as valid, given its unconscionable circumstances and results." Appellant's Brief at 39. An antenuptial agreement which is entered into in good faith, with full disclosure and with no fraud or overreaching, should be enforced as written; however, the terms of the agreement will also be subject to judicial scrutiny for unconscionability. *Rider v. Rider* (1995), Ind.App., 648 N.E.2d 661, 665, *reh'g denied.* A review for fraud, coercion, undue influence or unconscionability usually focuses on the circumstances surrounding the pre-marriage drafting and execution of the agreement. *Id.; Matuga,* 600 N.E.2d at 141.

■■■ As we discussed above, in the present case there is no evidence of fraud, coercion, or undue influence. Further, at the time the agreement was signed, Beulah owned stock worth $8,000.00 and had $14,000.00 in the bank. John had $4,000.00 in the bank and a mortgaged house. Thus, it may be inferred that the agreement, at least at its inception, served to protect and preserve Beulah's greater estate from commingling with John's smaller estate.

■■■ However, when an antenuptial provision divides property between the parties so as to leave one spouse after dissolution with insufficient property to provide for his or her reasonable needs, the court may refuse to enforce the antenuptial agreement. *Justus v. Justus* (1991), Ind.App., 581 N.E.2d 1265, 1274, *reh'g denied, trans. denied; see Rider,*

648 N.E.2d at 665. Beulah complains that the division of property pursuant to the antenuptial agreement she signed in 1971 is such a contract and the trial court erred by enforcing it. We cannot agree.

The record reveals that Beulah's separate property included real estate, IRA's, a thrift plan, an automobile, and personal property. She testified that her assets were valued in excess of $124,000.00. Beulah is earning approximately $32,000.00 annually and intends to work until she reaches retirement age. Upon retirement she will receive two small pensions.

John's assets, including real estate, bank accounts, an IRA, a 401k plan, an automobile, and personal property, were valued at $339,000.00. At the time of the final hearing, John was retired and received $2,323.08 per month in pension and a social security check.

Although we acknowledge that the trial court's enforcement of the antenuptial agreement leaves John with a greater share of the total assets of the parties, we cannot say that the trial court's action yielded an unconscionable result since neither spouse is left with insufficient property to provide for his or her reasonable needs.

■■ Beulah further argues that the circumstances of her married life make the distribution of property in accordance with the antenuptial agreement unconscionable. Specifically, she points to the holding of all their assets separately, Beulah's giving up of well-paying employment with the L & N Railroad in 1981 when the offices transferred to Florida, and her subsequent underemployment for the following four years. She also notes that John's income far exceeded hers throughout the marriage and the parties split all living expenses equally.

> One cannot envision a more unconscionable result than to allow John to demand one-half of his living expenses from Beulah, leaving him with more disposable income, allowing him to make purchases of property in his separate name, or with Beulah, as tenants in common only (Hebron Church Road property), or with his son (Shungate Road property), and then, by declaring the Antenuptial Agreement to be valid, giving

John the opportunity to argue that anything he acquired through his disposable earnings constituted separate property.

Appellant's Brief at 40. However, regardless of the manner in which the parties conducted their financial affairs during their marriage, a finding by the trial court that a antenuptial agreement was unconscionable must be supported by evidence that one spouse would not have sufficient property to provide for his or her reasonable needs after the dissolution of the marriage. The evidence in this case does not support such a conclusion.

Finally, Beulah contends that the antenuptial agreement is invalid because there was no meeting of the minds between the parties as to the legal effect that the agreement would have. In support of this contention, Beulah relies on two arguments.

First, she argues that she consistently testified that she believed that the agreement included only items of property held prior to the marriage, and she also testified that she believed that all the property that she acquired after the date of marriage was part of the marital pot subject to division.

These assertions amount to little more than a request to have us reweigh the evidence. This we will not do. As stated above, although Beulah's recollection of the meeting with the attorney before she signed the antenuptial agreement is quite different from John's and she now states that she did not understand the terms of the agreement, the trial court could properly rely on the uncontroverted evidence and John's testimony to support the validity of the agreement. We also note that the conduct of the parties during their marriage contradicts Beulah's contention regarding her understanding of the agreement.

 Second, Beulah asserts that the language of the antenuptial agreement is ambiguous as written and should be deemed unenforceable. "Since the document does not adequately define the intent of the parties as to the term 'separate property,' it is ambiguous and certainly should not have been declared valid." Appellant's Brief at 44.

 The language of the agreement speaks to the division of property upon divorce. The trial court gave the ordinary meaning to the words in the agreement. Although Beulah and John disagree twenty years after the signing of the agreement as to what the language means, the terms of a contract are not ambiguous merely because a controversy exists between the parties concerning the proper interpretation of the terms. *Tate v. Secura Ins.* (1992), Ind., 587 N.E.2d 665, 669. The trial court did not err in determining the meaning of the antenuptial agreement as a matter of law.

## II.

 Beulah also contends that the trial court erred by determining that the language of the antenuptial agreement was broad enough to encompass a waiver of either party's claim to the other's pension benefits. We do not agree.

In its order, the trial court specifically concluded that

2. Pursuant to the Agreement, any property either party owned prior to the marriage or which they purchased, accumulated or acquired separately during the marriage is the sole and separate property of each.

3. Pursuant to the Agreement, separate property includes [John]'s rights to pension benefits which existed before his marriage to [Beulah] and which have accrued during his marriage to [Beulah]. These benefits are [John]'s sole and separate property and [Beulah] has no claim thereto.

(R. at 423).

At the time that the antenuptial agreement was signed, pension rights were not marital property according to Indiana law. However, in 1980, P.L. 180 amended the definition of property in dissolution actions to include the present right to withdraw pension or retirement benefits and those benefits that are vested. *See* IND.CODE 31–1–11.5–2(d) (1993). Beulah argues that she could not waive her spousal interest in John's vested retirement benefits when the statutory right was not in existence at the time of the execution of the antenuptial agreement. Beulah presented testimony valuing John's pension

plan from Henry Vogt Machine Company at $270,557.65. Thus, if pension benefits are not found to be governed by the prenuptial agreement, the marital estate would be substantially increased.

■ A court should not re-write the contract of the parties; instead, we must liberally construe the agreement to effectuate the intent of the parties when they signed it. *Russell v. Walz* (1984), Ind.App., 458 N.E.2d 1172, 1179. Thus, although we have not previously examined the issue which Beulah raises we will look to see if the trial court's decision effectuated the original intent of the parties. In addition, we are guided by *Beatty v. Beatty* (1990), Ind.App., 555 N.E.2d 184, in which we addressed an analogous issue and found that the language of a prenuptial agreement was broad enough to constitute a waiver by the husband to share or elect to participate in his wife's estate by claiming his statutory allowance. In *Beatty*, a husband claimed a widower's allowance in his deceased wife's estate. The couple had signed an antenuptial agreement whereby they had each waived their rights to participate in the estate of the other. Although the trial court upheld the husband's claim because at the time the agreement was made he had no right to a widower's allowance, we held that the language of the antenuptial agreement was broad enough to encompass a waiver of a right which arose after the agreement was executed.

In our case, John and Beulah could not have known that Indiana law would change regarding the definition of marital property after they signed their antenuptial agreement. However, in 1971, they entered into an agreement, which states in pertinent part:

> WHEREAS, it is the intention of both [John] and [Beulah] to relinquish all their right, title, and interest whatsoever including any statutory rights given to either of them under the laws of the State of Indiana in and to the property, both real, personal, tangible and intangible of the other party.

(R. at 434). By this language, the parties acknowledged that they would be bound by the Indiana laws, and waived their statutory rights thereunder. Although the parties were not aware that their pensions would be determined to be marital assets, they were aware that they were waiving their rights to whatever the law entitled them to. We find that it was the intention of John and Beulah to exclude their individual assets including pension rights from the definition of marital property. Although the definition of marital property was later expanded to include pension rights, the parties' intentions regarding their separate property was clear from the outset.

In arguing for this court to reverse the trial court's order, Beulah relies on *Pedro Enter. Inc. v. Perdue* (1993), 7th Cir., 998 F.2d 491, *reh'g denied.* However, *Pedro* can be distinguished from the present case because the issue in that case was whether the antenuptial agreement constituted a waiver according to the requirements of the Employees Retirement Income Security Act (ERISA), and the court held that the agreement was not an effective waiver in accordance with the requirements of the federal law. In the present case, Beulah cannot point to any statutory requirements for the waiver of pension rights. We also note that the profit-sharing plan in *Pedro* did not come into existence until the couple had been married for more than two years. At the time the agreement was signed John had been employed by Henry Vogt Machine Company for 23 years and his pension rights existed.

■ Further, in order for a waiver of interest to be valid, the waiver must have been made knowingly, voluntarily and intelligently. *Marriage of Boren* (1985), Ind., 475 N.E.2d 690, 693. In the antenuptial agreement before us, John and Beulah acknowledged that further writings throughout their married life might be necessary to maintain their separate property. In order to fulfill this intent the agreement includes the following:

> Each party agrees that they will relinquish any and all right in and to the property coming into the hands of either of them and will convey and assign any and all right to said property if need be.

(R. at 435). Thus, under the facts of this action, the parties intended at the outset of

**1096**

the marriage to keep the property separate throughout their married life. Based on the language of the agreement, we cannot say the trial court erred when it found that such language was broad enough to encompass a waiver by Beulah of her statutory right to include John's pension in the marital estate.

Judgment affirmed.

CHEZEM and SULLIVAN, JJ., concur.