**Gregory D. PARDIECK, Appellant–Respondent,**

v.

**Julie G. PARDIECK, Appellee–Petitioner.**

No. 03A01–9607–CV–219.

Court of Appeals of Indiana.

Feb. 7, 1997.

---

John A. Stroh, Joan Tupin Crites, Sharpnack, Bigley, David & Rumple, Columbus, James A. Buck, Buck, Berry, Landau and Breunig, Indianapolis, for Appellant–Respondent.

Richard S. Eynon, Eynon & Harmon, P.C., Columbus, for Appellee–Petitioner.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

Gregory D. Pardieck ("Gregg") brings this interlocutory appeal from the trial court's order which refused to enforce the antenuptial agreement between him and Julie G. Pardieck ("Julie"). The trial court reasoned that Gregg did not act in good faith during the marriage, having used the antenuptial agreement in an unconscionable fashion to exclude assets from the marital estate. The court concluded that the agreement should be enforced to protect the property Gregg brought into the marriage, but would not be enforced to protect property acquired during the marriage.

We reverse.

### ISSUE

The sole issue presented for our review is whether the trial court erred when it refused to enforce the antenuptial agreement according to its terms.

### FACTS

When Julie and Gregg first met, in October of 1981, Gregg held an associate's degree in business and marketing and was employed as a sales manager at Arvin Industries, Inc. Julie had obtained both an associate's degree in health information technology as well as a bachelor's degree in health records administration. She was employed by the Jackson County Hospital as an assistant director of medical records. The two were married on April 9, 1983.

Prior to their marriage, Julie was aware that Parkland, Inc. was Gregg's family business and that Gregg owned shares in that business. Julie was also aware that Gregg owned a condominium in the Dominican Republic and that the family owned property called Peak Land.

During their engagement, Gregg proposed that he and Julie enter into an antenuptial agreement and contacted his attorney to draft the agreement. Julie did not want such an agreement. However, after several discussions they both signed an antenuptial agreement on March 4, 1983, a full month before their marriage. The relevant provisions of that agreement follow:

1. It is understood and agreed that each of said parties hereby declares it to be the intent and meaning of this agreement and indenture that during their marriage each of them shall be and continue completely independent of the other as regards the enjoyment and disposal of all property owned by them prior to said marriage, including later replacement property or proceeds or income from prior property, and each of them hereby agrees with the other, in view and consideration of said proposed marriage, that so far as is legally possible by their private act and agreement, all property belonging to either of them at the commencement of the marriage shall be enjoyed by him or her and be subject to his or her disposition as his or her separate property in the same manner as if said proposed marriage had never been celebrated.

2. Each of said parties shall retain all property, including later replacement property and proceeds therefrom, that he or she now has free from all claims of inheritance, distributive share, homestead, support, or any other interest commonly given by law to parties becoming husband and wife, and on the death of either of said parties or on the dissolution of the marriage relationship, all property, real or personal, held by either party at the commencement of the marriage, including later replacement property or proceeds or income from prior property, shall belong to such party, and shall descend according to law to his or her heirs, or be disposed of by will as fully as if no marriage relationship had ever existed between the parties hereto subject only to any other terms of this agreement.

3. It is agreed that each of said parties to this agreement hereby waive, and does hereby waive, all and every right whatsoever which he or she might have or acquire

by law by such marriage in any and all property, including later replacement property or proceeds or income from prior property, of every kind and character, real, personal, or mixed, now owned by the other party. . . .

\* \* \* \* \*

5. Wife specifically agrees that she gives up any right, title or claim to any common or preferred stock, and any appreciation thereof, in Parkland, Inc. acquired by Husband prior to the contemplated marriage.

\* \* \* \* \*

11. There shall be a community of assets, not to include replacement property or proceeds or income from prior property, and gains between the contracting parties from the date of the celebration of their said marriage to each other, which said community of assets and gains shall embrace all future acquisitions and shall embrace only said future acquisitions, all of their separate property herein specified and set forth to be and remain distinct and separate property and to form no part whatsoever of the said community of assets and gains.

Record at 161.

Exhibit A of the agreement lists Gregg's assets as:

Common stocks Parkland, Inc.
$25,000.00 savings
$50,000.00 D.R. [Dominican Republic]
 condominium
$40,000.00 Peak Land
――――――――
$115,000.00 +

The attachment also disclosed that Gregg expected to inherit one million dollars in property and stocks from his parents, Ralph and Ruth Pardieck. Record at 161.

After the parties were married, Gregg left Arvin Industries to become the vice president of Onyx Paving, Inc. Onyx Paving is a wholly-owned subsidiary of Parkland, Inc. and is estimated to be worth approximately five million dollars. Gregg and Julie also built a home on the Peak Land property, but the deed is in Gregg's, his brother's, and his mother's names.

Julie filed her petition for dissolution on July 1, 1994, and Gregg filed his "Petition for Determination of Validity of Pre–Marital Agreement" on August 26, 1994. Hearings were held before a senior judge on Gregg's petition and the court concluded that Gregg did not act in good faith during the course of the marriage and entered an order which stated:

> The pre-marital agreement shall not be invoked to prevent Julie from claiming an interest in the family residence located in Peak Land, and from claiming an interest in the reasonable value of profits, earnings, and capital assets accumulated in Parkland, Inc. and its subsidiaries resulting from Gregory's services to those corporations and his right to receive profits therefrom.

Record at 65. Gregg filed a Motion in Limine in which he asked the court to clarify that ruling. After a hearing, the regular judge of the Bartholomew Circuit Court entered findings and concluded that Gregg had a duty to act in good faith and that he should not be allowed to benefit from violating that duty. The court's order states that:

> This court will enforce the Pre–Marital Agreement as it relates to the value of the assets which were listed in the agreement and will set aside to Gregory those values as of the date of the marriage. This Court will not sift through the marriage on a month to month or year to year basis and make a determination as to which acts were in bad faith. Rather, this Court will consider all property acquired during the marriage to be in the marital pot (except perhaps gifts and inheritances—there hasn't been enough evidence on this issue for the court to make a determination). Therefore, Julie is entitled to discovery which will enable her to value the assets at the time of the marriage so that she can compare this value with the assets at the time of separation.

Record at 13–131. Gregg appeals from that decision.

## DISCUSSION AND DECISION

Gregg contends that the trial court erred when it refused to enforce the entire ante-

nuptial agreement between him and Julie.[1] We must agree.

Antenuptial agreements are legal contracts entered into prior to marriage which attempt to settle the interest each spouse has in property of the other, both during the marriage and upon its termination. *Rider v. Rider*, 669 N.E.2d 160, 162 (Ind.1996). These agreements are to be construed according to principles applicable to the construction of contracts. *Ryan v. Ryan*, 659 N.E.2d 1088, 1092 (Ind.Ct.App. 1995), *trans. denied.* To interpret a contract, a court first considers the parties' intent as expressed in the language of the contract. *Id.* The court must read all of the contractual provisions as a whole to accept an interpretation which harmonizes the contract's words and phrases and gives effect to the parties' intentions as established at the time they entered the contract. *Id.* Antenuptial agreements must be honored and enforced by the courts as written. *In re Marriage of Boren*, 475 N.E.2d 690, 694 (Ind.1985).

Here, the trial court determined that the agreement was not unconscionable but that it should not be enforced. Specifically, the court carved out a new exception to the enforcement of antenuptial agreements and concluded that due to Gregg's lack of "good faith" during the marriage, the antenuptial agreement does not prohibit Julie from claiming an interest in the reasonable value of profits, earnings and capital assets accumulated in Parkland, Inc. and its subsidiaries resulting from Gregg's services to those corporations. That conclusion is contrary to the express terms of the antenuptial agreement and Indiana law.

Under the agreement, Gregg retains "all property, including later replacement property and proceeds therefrom," which includes the Parkland common stock, savings, Dominican Republic condominium and Peak Land. Record at 161. Each party is to "retain all property" and "proceeds or income from prior property." Record at 161. Not only did

Julie sign the agreement which provided that Gregg would retain any and all proceeds or income from the Parkland stock, she specifically agreed to:

> [G]ive up any right, title or claim to any common or preferred stock, and any appreciation thereof, in Parkland, Inc. acquired by Husband if Husband acquires same by gift or inheritance after the contemplated marriage between the parties.

Record at 161.

Julie contends the agreement provides that "there shall be a community of assets" and that Gregg violated this provision by shielding assets within Parkland, Inc. *See* Record 161, Paragraph 11. However, as indicated above, Julie also agreed to give up her rights to the proceeds from or appreciation in value of the Parkland stock and other assets specifically enumerated in the agreement. The rules of contract construction require the court to construe the provisions of a contract together, and specific terms control over general terms. *Arnold v. Burton*, 651 N.E.2d 1202, 1205 (Ind.Ct.App.1995), *trans. denied.*; *Fowler v. Campbell*, 612 N.E.2d 596, 600 (Ind.Ct.App.1993). The agreement specifically identified the Parkland common stock as Gregg's separate and distinct property, and the agreement also provides that the separate property is "to form no part whatsoever of the said community of assets and gains." Record at 161, Paragraph 11. These specific provisions control over the more general agreement of the parties to build a community of assets. Thus, the disposition of the Parkland common stock is governed by the specific terms of the agreement which provide that Gregg shall retain all rights in the Parkland common stock.

The agreement's terms, "appreciation" and "proceeds," indicate that both parties intended that any increase in the value of the assets listed on Exhibit A, including the Parkland common stock, were to remain Gregg's property. *See Kemp v. Kemp*, 485 N.E.2d 663, 667 (Ind.Ct.App.1985) (terms

---

**1.** Julie argues that the issue presented to the trial court was whether she would be allowed discovery of the assets acquired by Gregg during the marriage. However, the trial court decided not to enforce the antenuptial agreement but to con-

sider all property acquired during the marriage to be in the marital pot. Because the trial court refused to enforce the terms of the antenuptial agreement, we will consider its validity on this appeal.

"accessions," "increments," and "proceeds" intended to entail increases in initial value of asset). Onyx Paving, Inc. is a wholly owned subsidiary of Parkland, Inc. The increase in the value of Onyx Paving, Inc. also increases the value of the Parkland, Inc. stock owned by Gregg. Under the premarital agreement, Gregg retained any appreciation in the value of that stock.

 Still, antenuptial agreements may be set aside by the trial court under two circumstances. First, the agreement may be set aside if at the time the agreement is entered into there is evidence of fraud, duress, or misrepresentation, and the agreement is unconscionable. *Rider*, 669 N.E.2d at 162. Second, if circumstances change during the course of the marriage, the court may look to circumstances at the time of dissolution to determine the unconscionability of an antenuptial agreement. *Id.* at 163; *Justus v. Justus*, 581 N.E.2d 1265, 1274 (Ind.Ct.App. 1991), *trans. denied.* At the time of dissolution, a court may decline to enforce an antenuptial agreement when enforcement would leave a spouse in the position where she would be unable to support herself. *Justus*, 581 N.E.2d at 1273. A finding of unconscionability requires a comparison of the situations of the two parties. *Rider*, 669 N.E.2d at 164. Unconscionability involves a "gross disparity." *Id.*

Neither party argues that the agreement was unconscionable at the time it was executed. Gregg correctly points out that the only other method for setting-aside the agreement is the second exception, but that the agreement was not unconscionable at the time of dissolution. The court found that Julie has an associate's degree as well as a bachelor's degree. She "earns approximately $27,000 per year at the Columbus Regional Hospital where she is Director of Medical Records."

Record at 64. Gregg holds an associate's degree, is employed as the vice president and manager of Onyx Paving, Inc. and "is paid approximately $31,000 per year by Parkland, Inc." Record at 62, 64. To conclude that an antenuptial agreement is unconscionable at the time of dissolution, the evidence must show that one spouse would not have sufficient property to provide for his or her reasonable needs after the dissolution of the marriage. *Ryan v. Ryan,* 659 N.E.2d 1088, 1094 (Ind.Ct.App.1995), *trans. denied.* Based upon Julie's education, employment history and salary, we cannot conclude that the agreement was unconscionable at the time of dissolution.

 Finally, we address the trial court's creation of a "good faith" exception to the enforcement of an otherwise valid antenuptial agreement. The court concluded that it could set aside the agreement "where one of the parties did not act in good faith throughout the course of the marriage, using the antenuptial agreement in an unconscionable fashion to shield what would normally be marital assets." Record at 127.

 Even accepting the trial court's finding that Gregg acted in bad faith during the marriage, we decline to create a new exception to the enforcement of an otherwise valid antenuptial agreement.[2] Indiana law does not require that a general duty of good faith and reasonableness be implied in every contract. *See First Federal Savings Bank v. Key Markets,* 559 N.E.2d 600, 604 (Ind.1990) (not court's province to require party acting pursuant to unambiguous contract to be "reasonable," "fair," or show "good faith cooperation"). To the contrary, when a court finds a contract to be clear in its terms and the intentions of the parties apparent, the court will require the parties to perform consistently with the bargain they made. *Id.*[3]

**2.** The court found that Gregg promised to place Julie's name on the deed to the marital residence, but failed to do so. Record at 127. Gregg also shielded the Onyx Paving, Inc. assets by making it a fully-owned subsidiary of Parkland, Inc. Record at 127.

**3.** Julie directs this court to *Hamlin v. Steward,* 622 N.E.2d 535 (Ind.Ct.App.1993), for the proposition that a duty of good faith must be implied in this contract. In *Hamlin,* the parties' contract

was conditioned upon the promisors' performance of a specific event. We concluded that "we must infer good faith in the performance of the condition in order to give meaning to the intention of the parties." *Id.* at 541. Without good faith, the mere promise to pay subject to a condition precedent to be performed by the promisor would be an illusory promise. *Id.* Unlike *Hamlin,* this case does not involve an illusory promise, and we need not infer good faith.

Here, the contract terms are clear and unambiguous. The assets Gregg listed in Exhibit A, including the Parkland, Inc. stock, are his separate property and are not subject to division. As stated earlier, this necessarily includes the assets accumulated by Onyx Paving, Inc. Julie does not have access to the wealth accumulated by her husband under Parkland, Inc. While that result may now seem harsh after 11 years of marriage, Julie freely entered into the antenuptial agreement, and the agreement was not unconscionable at the time of dissolution. As a general rule, the law allows persons of full age and competent understanding the utmost liberty to contract, and their contracts, when entered into freely and voluntarily, are enforced by the courts. *Pigman v. Ameritech Publishing Inc.*, 641 N.E.2d 1026, 1029 (Ind. Ct.App.1994). Thus, we conclude that the trial court erred when it refused to enforce the antenuptial agreement according to its terms.

Reversed.

ROBERTSON and BAKER, JJ., concur.

An illusory promise is a promise which by its terms makes performance entirely optional with the promisor. RESTATEMENT (SECOND) OF CONTRACTS § 2 cmt. e (1981). Here, the contractual provision at issue required the creation of a community of assets. Fulfillment of that provision did not rest solely with Gregg, but required the cooperation of both parties to the agreement. Further, the evidence indicates that the parties did create "a community of assets." The two built and furnished a home together, purchased an automobile, maintained a joint account and acquired many other items of personal property. Record at 202.