In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2355

Craig Penn,

Plaintiff-Appellee,

v.

Ryan's Family Steak Houses, Inc.,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 99-CV-0530--William C. Lee, Chief Judge.

Argued November 28, 2000--Decided October 17, 2001


   Before Harlington Wood, Jr., Diane P. Wood,
and Evans, Circuit Judges.

   Diane P. Wood, Circuit Judge.  Craig Penn
worked as a server at Ryan's Family Steak
Houses (Ryan's) in Fort Wayne, Indiana,
from 1996 until 1998. After he was fired,
he filed this suit under the Americans
with Disabilities Act (ADA) alleging that
he had been subjected to a hostile work
environment at Ryan's and that he was
fired in retaliation for his complaints
about the harassment. In the district
court, Ryan's filed a motion seeking to
stay the case and compel arbitration,
alleging that Penn was bound by an
arbitration agreement he signed when he
applied for his job at Ryan's. The
district court found that the arbitration
agreement Penn signed would create an
arbitration panel that was biased in
favor of Ryan's. In addition, the court
found that Penn had not made a knowing
and voluntary waiver of his right to a
judicial forum for his dispute, an
omission the court found fatal to the
company's effort to enforce the
agreement. For these reasons, the
district court denied the motion Ryan's
had filed. Ryan's brought an
interlocutory appeal of that order
pursuant to 9 U.S.C. sec. 16(a) (1)(A) &
(B). We agree with the district court
that the arbitration contract Penn signed
is unenforceable, although we reach that

conclusion for different reasons.

I

At the outset, it is important to make one thing clear: Penn never signed an arbitration agreement, pre-employment or otherwise, with Ryan's. We thus do not have before us the conventional case in which the question is whether a particular dispute falls within the scope of an arbitration agreement or whether an alleged agreement between an employer and its employee to arbitrate various disputes is unenforceable for some reason. The document relating to arbitration that Penn signed was quite a different animal. Before Penn ever arrived on the scene, Ryan's had entered into a contract with a company called Employment Dispute Services, Inc. (EDS) to have EDS provide an arbitration forum for all employment-related disputes between Ryan's and its employees. When Penn applied for a job at Ryan's, Ryan's required him to execute a contract with EDS. That contract in turn expressed Penn's agreement to use EDS's services to arbitrate any employment-related claims he might have against Ryan's. The document went on to state explicitly that it was a contract with EDS, not with Ryan's, although it added that Ryan's was a third-party beneficiary of the contract. EDS's sole business is apparently the provision of arbitration services for employment disputes according to this model: EDS contracts with employers to provide an arbitration forum for any claims the company's employees bring against it, and the companies that contract with EDS then require their employees to enter into separate contracts with EDS.

The arbitration agreement that Penn signed is largely devoid of specifics about the obligations it imposes on EDS. The contract goes on for two pages detailing the types of claims Penn is required to arbitrate. The only mention of any EDS responsibility, however, is a brief phrase saying that Penn is agreeing to the contract "[i]n consideration of the agreement by EDS to provide an arbitration forum." At the same time he received and signed the arbitrationagreement, Penn also received a copy of EDS's Rules and Procedures (the Rules), which set out the specifics of

the services EDS provides in somewhat more detail. According to that document, EDS provides parties to disputes before it with a panel of three arbitrators: one a member of management at a company that uses EDS's services (but not the company involved in the dispute), one a non-management employee of one of the EDS companies, and the third an "[a]ttorney[ ], retired judge[ ], or other competent professional person[ ] not associated with either party." When an employee brings a dispute to EDS for arbitration, EDS provides the parties to the dispute with a list of three potential arbitrators in each category (managers, employees, and neutrals). Each side is allowed one strike in each category, and the remaining three arbitrators form the panel. The Rules also allow each side unlimited strikes "for cause." Although the procedure after a potential arbitrator is struck for cause is not explained in the Rules, it appears that EDS would then add another potential arbitrator to the list so that the parties could move on to their peremptory strikes. EDS retains discretion to determine whether an arbitrator will be struck for cause and also retains complete control over whoappears on the lists of proposed arbitrators.

The Rules set out limited procedures for discovery, allowing each side unlimited document requests, but only one deposition in the absence of extraordinary circumstances. The Rules provide that the arbitrators must apply the substantive law that would have applied to the employee's claim in a court of competent jurisdiction and that the decision of the panel will be final and binding. The panel of arbitrators is given discretion to set the time and place of the hearing. Finally, the Rules charge the chief executive officer of EDS with interpreting the Rules and deciding "any issue which may arise relating to them," and give EDS the power unilaterally to amend or modify the Rules.

In the district court, Penn argued that the EDS arbitration system is inherently biased against employees. Relying on cases such as Hooters of America, Inc. v. Phillips, 173 F.3d 933, 938-39 (4th Cir. 1999), Penn reasoned that an arbitration agreement that forces a party to

arbitrate before a biased tribunal cannot be enforceable. Although Penn raised objections to several aspects of the EDS system, the overarching theme of his challenge was that EDS is no more than a straw-man for the employers who fund it, and thus, presumably, any award they rendered would reflect the kind of "evident partiality" that the Federal Arbitration Act (FAA), 9 U.S.C. sec. 10(a)(2), recognizes as a reason for unenforceability. As Penn notes, with the exception of relatively insignificant filing fees, employers pay the cost of EDS arbitration. Unlike some other arbitration fora such as the American Arbitration Association, EDS handles only employment arbitration, so essentially all of its funding comes from employers. In addition, the employers who contract with EDS are repeat players, and if an employer becomes dissatisfied with EDS's services, EDS stands to lose a substantial amount of business. On the other hand, EDS has no incentive to seek approval from the employees who appear before it, because the employees are for all practical purposes captive customers. For all these reasons, Penn argues, EDS has a very strong incentive to tilt its arbitration panels in favor of the companies that employ it.

EDS also has ample opportunity to tilt the scales. As noted above, the contract Penn signed with EDS provides no details about the forum that will be provided. Although the Rules and Procedures do set out more specifics, EDS retains the right to modify them at any time without notice to or consent from the employees who have entered into the EDS agreements. Even as the Rules stand, Penn argues, EDS has substantial opportunity to shade its procedures in favor of employers. First, unlike the usual system with two partisan arbitrators and one neutral, under which each party has free rein to name its own advocate, here EDS has complete control over the names that appear on the lists for both the employer's arbitrator and the employee's arbitrator. Although both the employer and the employee have the right to strike arbitrators from the lists for cause, this feature is of little practical help to the employee as long as EDS controls the three names from which the employee must choose. Nothing prevents EDS from finding the stool pigeons among the employee population and

offering the employee only the opportunity to choose the least among three evils. In addition, EDS's rules contain very restrictive discovery provisions, allowing each side only one deposition in most cases. As Penn points out, employment disputes are often extremely fact-intensive battles between witnesses with sharply different recollections of events, and a single deposition is likely to be inadequate in many cases. Although the Rules allow parties to petition the arbitration panel for permission to take additional depositions in "extraordinary fact situations," the Rules also explicitly discourage such requests. If the panels are indeed predisposed against employees, as Penn suggests, an employee seeking permission to conduct additional discovery would most likely face an uphill battle. Finally, under the Rules set out by EDS, EDS has complete discretion over the location and time of the arbitration proceedings. This power, Penn argues, could easily be used to inconvenience an employee or impose exorbitant travel expenses on him.

In response to Penn's objections, Ryan's introduced an affidavit from the Chairman and co-owner of EDS, James P. LaCoste, which addressed many of Penn's concerns. First, LaCoste averred that the EDS process for selecting arbitrators incorporated "numerous safeguards" to "ensure fairness and neutrality of the panel." The lists of potential arbitrators are generated solely by EDS, LaCoste noted, and employers have "absolutely no input" into the selection of potential arbitrators. In addition, both the management arbitrator and the employee arbitrator are "neutral" in the sense that they are not employed by, and do not have any ties to, the employer involved in the dispute. The third arbitrator, according to LaCoste, is a "neutral, respected attorney." LaCoste stressed that EDS is "neither controlled, managed nor influenced by Ryan's Family Steak Houses." Finally, in response to Penn's concern about being forced to arbitrate far from home, LaCoste stated that "[t]he physical location of the adjudication hearings is the city and/or county in which the employee was employed."

After considering the EDS contract, the

Rules, and LaCoste's affidavit, the district court concluded that the EDS system was inherently biased against employees and therefore refused to compel Penn to arbitrate his ADA claim. The district court accepted Penn's contention that EDS had very strong financial incentives to tilt its scales towards employers, and against this backdrop, the court found that the system allowed EDS entirely too much discretion. The court was particularly troubled by the fact that EDS, which the court saw as essentially an alter-ego for the employer, had complete control over the lists of potential arbitrators. The court was also concerned that the restrictive discovery provisions would be enforced unfairly against employees. In the alternative, the district court applied a standard borrowed from the Ninth Circuit, which requires that an employer seeking to enforce an arbitration agreement show that the employee knowingly waived a judicial forum. See, e.g., Prudential Ins. Co. v. Lai, 42 F.3d 1299, 1305 (9th Cir. 1994). It held that Ryan's had not met that standard in this case.

II

Arbitration has become a common tool in resolving employment disputes in recent years, and employers are increasingly requiring employees to sign contracts obligating them to arbitrate disputes as a condition of employment. The Supreme Court's recent decision in Circuit City Stores, Inc. v. Adams, 121 S. Ct. 1302 (2001), removes any lingering doubts as to whether these agreements are enforceable under the FAA. In the wake of Circuit City, it is clear that arbitration agreements in the employment context, like arbitration agreements in other contexts, are to be evaluated according to the same standards as any other contract.

The Supreme Court has repeatedly counseled that the FAA leaves no room for judicial hostility to arbitration proceedings and that courts should not presume, absent concrete proof to the contrary, that arbitration systems will be unfair or biased. See, e.g., Green Tree Financial Corp. v. Randolph, 121 S. Ct. 513, 522 (2000); Gilmer v. Interstate/ Johnson Lane Corp., 500 U.S. 20, 30 (1991). In this appeal, Ryan's

argues that the district court violated these principles when it determined that the EDS system was inherently biased against employees. While the district court was correct to recognize that at some point an arbitral procedure may become so biased (perhaps because of "evident partiality" of the arbitrators, perhaps for another reason) that an award would not be entitled to recognition and enforcement, we are concerned that the district court placed too much weight on certain specifics of this system that, in and of themselves, do not distinguish it from many others that have passed muster (such as funding from someone principally associated with the employer, see Gilmer, supra, or limited discovery, id. at 30-32). The court placed little weight on the safeguards that EDS had built into its system, particularly the unwritten rules that LaCoste, who is charged with interpreting the EDS Rules, described in his affidavit. Ultimately, though, we need not resolve whether the EDS system is so deeply flawed that it should be re jected on its face (a difficult standard to meet, as Green Tree makes clear), as opposed to compelling its use in arbitra tions and evaluating the enforceability of particular awards. In this case, we find that regardless of the merit of EDS's system, Penn never entered into an enforceable contract to participate in it.

While the Supreme Court has stressed in recent years that federal policy under the FAA favors the enforcement of valid arbitration agreements, see, e.g., Circuit City, 121 S. Ct. at 1307; Gilmer, 500 U.S. at 24, the Court has been equally adamant that a party can be forced into arbitration only if she has in fact entered into a valid, enforceable contract waiving her right to a judicial forum. AT&T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 648 (1986) ("[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration anydispute which he has not agreed so to submit."). Whether the parties have agreed to arbitrate is determined under ordinary state law contract principles. Gibson v. Neighborhood Health Clinics, Inc., 121 F.3d 1126, 1130 (7th Cir. 1997). Because Indiana was the situs of all relevant events in this dispute, we apply that state's law in analyzing the

contract question. Id. The threshold question in this case, therefore, is whether the arbitration agreement that Penn signed amounted to an enforceable contract under Indiana law.

The existence of a valid Indiana contract depends on mutuality of obligation. "[T]here can be no contract unless both parties are bound." Rogier v. American Testing & Eng'g Corp., 734 N.E.2d 606, 618 (Ind. Ct. App. 2000). Although mutual promises can form the consideration for a valid contract, Hamlin v. Steward, 622 N.E.2d 535, 539 (Ind. Ct. App. 1993), "a contract is unenforceable if it is so indefinite and vague that the material provisions cannot be ascertained." Pepsi-Cola General Bottlers v. Woods, 440 N.E.2d 696, 699 (Ind. Ct. App. 1982). An illusory promise, one which "by its terms makes performance entirely optional with the promisor," cannot form the basis for a valid contract, Pardieck v. Pardieck, 676 N.E.2d 359, 364 n.3 (Ind. Ct. App. 1997), because "a contract is unenforceable if it fails to obligate [one party] to do anything." Indiana-American Water Co. v. Town of Seelyville, 698 N.E.2d 1255, 1260 (Ind. Ct. App. 1998).

As we have already observed, this case differs from the typical case in which an employer and employee agree to arbitrate their disputes because of the complicated three-party approach by which Ryan's sought to bind Penn to arbitration. Although Penn obviously was motivated to sign the arbitration agreement because Ryan's otherwise would not have considered him for employment, the contract that Penn signed underscores that it is between Penn and EDS and that Ryan's is not a party to the contract. (We add for the sake of completeness that if the Penn-EDS contract is not valid, then the claim Ryan's has to third-party beneficiary status also falls by the wayside.) The first question is therefore whether the Penn-EDS contract contains mutual promises and commitments by each party to the other.

We conclude that it does not; to the contrary, the arbitration agreement between EDS and Penn contains only an unascertainable, illusory promise on the part of EDS. The agreement is clear enough as to what Penn is promising: he

agrees that he will bring any employment-related dispute that he has with Ryan's in the EDS arbitration forum and not in state or federal court. The agreement restates this proposition several times in various ways, and goes into some detail as to the types of disputes that are covered by the agreement and the duration of Penn's obligation. In marked contrast to the specificity of Penn's obligation is the language describing the consideration EDS is obligated to provide Penn in return: EDS commits itself only "to provide an arbitration forum, Rules and Procedures, and a hearing and decision based on any claim or dispute" that the employee might raise. Nothing in the contract provides any details about the nature of the forum that EDS will provide or sets standards with which EDS must comply; EDS could fulfill its promise by providing Penn and Ryan's with a coin toss. Although Penn was given the EDS Rules along with the contract he signed, and we will assume that the Rules form part of the contract, adding the Rules to the mix does nothing to make EDS's commitment more concrete, because the Rules specifically give EDS the sole, unilateral discretion to modify or amend them. The contract is therefore hopelessly vague and uncertain as to the obligation EDS has undertaken. For all practical purposes, EDS's promise under this contract "makes performance entirely optional with the promisor." Pardieck, 676 N.E.2d at 364 n.3. The Sixth Circuit has recently held that these defects with identical EDS arbitration agreements render the agreements unenforceable as a matter of Tennessee and Kentucky law, see Floss v. Ryan's Family Steak Houses, Inc., 211 F.3d 306, 315-16 (6th Cir. 2000).

This is not the end of our inquiry. Indiana law does not require that both promises of obligation be contained in the contract at issue. It is also permissible to incorporate such contract terms by reference in a separate contemporaneous document. Goeke v. Merchants Nat'l Bank & Trust Co. of Indianapolis, 467 N.E.2d 760, 768 (Ind. Ct. App. 1984). Thus, we may also search other agreements to locate a promise that binds EDS, as "consideration for the promise in one instrument may be contained in another." Gibson, 121 F.3d at 1131. The only other contract

involving EDS here is its contract with Ryan's, which hypothetically could contain a promise to take some action in this contract that would have the effect of binding it with respect to Penn. But the EDS-Ryan's contract also does nothing to limit EDS's ability to amend its procedures, reinforcing our opinion that its promise to Penn is unenforceable and illusory. The fact that EDS and Ryan's may cancel their agreement with ten days' notice also does nothing to inspire our confidence that EDS is incurring any real detriment here.

The last place we can look for some mutuality of obligation is in the employment application Penn submitted to Ryan's. Mutuality can be imposed not only through a detriment to the promisor but also through a benefit to the promisee. Paint Shuttle, Inc. v. Continental Cas. Co., 733 N.E.2d 513, 523 (Ind. Ct. App. 2000). The application twice states that all applicants must sign the arbitration contract with EDS in order to be considered for employment with Ryan's. Perhaps, then, this benefit could be seen as consideration for Penn's agreement to arbitrate.

We have several problems with such an approach. First, despite a careful search, we find no support in Indiana law for the proposition that a benefit received from a third party, as opposed to a benefit received from the other contracting party in a contemporaneous document, can be sufficient to create mutuality. Even in the surety and guaranty context, the Indiana courts have always found the promises constituting consideration in contemporaneous agreements involving the promisor and promisee, not third parties. See, e.g., Goeke, 467 N.E.2d at 768; Torres v. Meyer Paving Co., 423 N.E.2d 692, 695 (Ind. Ct. App. 1981). Second, even if such an approach were possible, the two agreements do not seem to relate to the same basic subject matter. Compare Leatherman v. Management Advisors, Inc., 448 N.E.2d 1048, 1050 (Ind. 1983) (finding no consideration because agreements had different subject matters, one relating to employment and the other to sales accounts). Third, while an offer of employment may constitute consideration for a separate agreement, Advanced Copy Products, Inc. v. Cool, 363

N.E.2d 1070, 1071 (Ind. Ct. App. 1977), the defendants provide no evidence that any Indiana court has ever held that a mere promise to consider an application for employment would provide consideration for a separate contract. Finally, we note that the parties could have solved their consideration problem entirely simply by making Ryan's a party to the contract. (Perhaps the parties avoided such a direct provision for fear that the Supreme Court might use Circuit City to strike down or restrict such agreements--a fear that has since proved unfounded. If so, the half-life of the kind of system EDS has been using may be rather short at this point.) While this may be a formal distinction, the fact remains that EDS and Ryan's affirmatively chose to structure their transaction this way. Contracts are in part about formalism, and courts do not simply rewrite them to provide the necessary elements of initial contract formation. Compare General Motors Corp. v. Northrop Corp., 685 N.E.2d 127, 135 (Ind. Ct. App. 1997) ("Courts do not have the power to create for the parties a contract which they did not make.") Therefore, we find that any promises Ryan's made to induce Penn to enter the contract with EDS did not create an enforceable contract between those parties.

For these reasons, we hold that the arbitration agreement between Penn and EDS is not enforceable. Given this holding, we need not decide whether this circuit should adopt the Ninth Circuit's "knowing and voluntary waiver" standard for evaluating the enforceability of arbitration agreements in the employment context, although we question the continued validity of such an approach in light of the Circuit City decision. See 121 S. Ct. at 1313 ("We have been clear in rejecting the supposition that the advantages of the arbitration process somehow disappear when transferred to the employment context."). The decision of the district court is Affirmed, and the case is remanded for further proceedings.


HARLINGTON WOOD, JR., Circuit Judge, concurring. I completely agree with the careful and thoughtful analysis of the foregoing opinion and the result reached, and only write separately to note a few

practical considerations to put this in perspective. It was an unfair situation from its inception.

   Penn was being hired as a waiter in a chain restaurant, not as a corporate executive. His employment was only to be "at will." Likely a substantial share of his income would be from tips. The agreement, the rules, the relationships between the parties, and the ramifications of the arbitration arrangement have now reached this court to sort out. Above his signature this agreement states that Penn signed it "knowingly and voluntarily." We doubt it could have been "knowingly" in view of its complexities, or even "voluntarily." Had he questioned its meaning and its complexities, it is doubtful Penn would have been hired. However, the agreement provided that Penn had the right to consult an attorney, but even if Penn could have afforded an attorney, the appearance of any attorney on the scene would doubtless have foreclosed any job opportunity. In Ryan's eyes, Penn would look like a troublemaker. If he wanted the waiter's job, he would be trapped in an unfair situation until a court could unravel it.