**Kevin P. BENNETT, Plaintiff–Appellant,**

v.

**CISCO SYSTEMS, INC., Defendant–Appellee.**

No. 01–4347.

United States Court of Appeals, Sixth Circuit.

April 22, 2003.

Before MOORE and GIBBONS, Circuit Judges, and COHN, District Judge.*

COHN, District Judge.

This is an employment case. Plaintiff–Appellant Kevin P. Bennett appeals from the district court's order granting Defendant–Appellee Cisco Systems Inc.'s motion for judgment on the pleadings and compel-

* The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

ling Bennett to arbitrate Cisco's claim against Bennett arising out of his employment and from the district court's order granting Cisco's motion for summary judgment on Bennett's defamation claim against Cisco. Finding no error, we will affirm the judgments of the district court.

## I. BACKGROUND

Cisco is a California company that develops and markets networking products for the Internet. Bennett began working for Cisco in 1994. At some point, Bennett left Cisco to work for a Silicon Valley start-up company but returned to Cisco in 1997. He was most recently employed as an operations director, heading Cisco's sales operations in Florida and other states and was apparently located in Ohio. When Bennett returned to employment with Cisco in 1997, he signed a document entitled "Terms and Conditions" which contains the arbitration clause at issue here. In November 1999, Bennett resigned and took a position with a smaller competitor of Cisco.

On April 26, 2000, Cisco filed a demand for arbitration with the American Arbitration Association (AAA) in California claiming that Bennett and another former Cisco employee used their positions to benefit themselves at Cisco's expense by participating in a kickback scheme with companies doing business with Cisco and improperly exercising stock options. Cisco sought millions of dollars in damages.

Bennett filed suit in federal district court against Cisco seeking a declaratory judgment that the arbitration clause in his employment agreement did not bind him to arbitrate the claims asserted in Cisco's arbitration demand, and claiming that Cisco defamed Bennett based on statements appearing in the Wall Street Journal and Reuters News Service attributed to Cisco employees which indicated that Bennett was unethical. The articles appeared the day after Cisco filed its demand for arbitration. The background regarding the statements and Bennett's defamation claim is discussed *infra*.

Cisco filed a counterclaim, seeking, *inter alia,* an order compelling Bennett to arbitrate all of his claims. The district court ordered that Cisco's claim against Bennett proceed in arbitration but found that Bennett's defamation claim did not arise out of Bennett's employment and was therefore not subject to arbitration. Cisco's case against Bennett proceeded to completion in arbitration in California, where Cisco prevailed.[1]

Cisco moved for summary judgment on Bennett's defamation claim. The district court granted the motion finding that (1) Bennett failed to present admissible evidence that Cisco made the alleged defamatory statements attributed to it in the articles and (2) Bennett failed to present evidence that the statements were materially false.

## II. ANALYSIS

### A. Standard of Review

We review an entry of judgment on the pleadings *de novo.* *Grindstaff v. Green,* 133 F.3d 416, 421 (6th Cir.1998).

A grant of summary judgment is reviewed *de novo.* *Wathen v. General Elec-*

---

**1.** The arbitrator's decision was issued during the pendency of this appeal. The arbitrator found that Bennett had breached his obligations under his employment agreement, abused his agency relationship, and violated his fiduciary duties by receiving kickbacks.

The arbitrator awarded Cisco approximately $5.3 million dollars, plus interest and costs. The arbitrator also required Bennett to repay $430,607.43 in stock options that he had improperly exercised.

*tric Co.*, 115 F.3d 400, 403 (6th Cir.1997). Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

We must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *In re Dollar Corp.*, 25 F.3d 1320, 1323 (6th Cir.1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). We "must view the evidence in the light most favorable to the non-moving party." *Employers Ins. of Wausau v. Petroleum Specialties, Inc.*, 69 F.3d 98, 101 (6th Cir.1995).

### B. Arbitration

#### 1.

■ Bennett argues that the arbitration agreement does not cover claims that Cisco brings against the employee, but that it is unilateral—and thus, Bennett argues, unenforceable—and covers only claims that Bennett might bring against Cisco. Bennett also argues that the agreement is invalid because it contains a financial obligation on the part of the employee to share in the costs of arbitration.

The arbitration provision provides in relevant part:

I agree that any and all disputes that I have with the Company, or any of its employees, which arise out of my employment or under the terms of this Agreement, shall be resolved through final and binding arbitration, as specified herein. This shall include, without limitation, disputes relating to this Agreement, my employment by the Company or the termination thereof, claims for breach of contract or breach of the covenant of good faith and fair dealing, and any claims of discrimination or other claims under Title VII of the Civil Rights Act of 1964....

The district court rejected Bennett's argument that the arbitration provision is void because it does not impose an obligation on Cisco to arbitrate a claim against Bennett. The district court focused on the language which says that Bennett shall arbitrate "disputes" with Cisco, not "claims." Thus, because Cisco's claim against Bennett is a "dispute with the Company" it is subject to arbitration. As the district court stated: "The description of the arbitration agreement describes an arbitration initiated by the employee but this does not modify the scope of the arbitration agreement which covers claims by either party." We agree. We also note that the arbitration provision says that Bennett will arbitrate "disputes *with the* Company" as opposed to disputes *against* the Company. The use of such language contemplates arbitration of disputes initiated by either party.[2]

2. In the case against Bennett's alleged co-conspirator, Vince Rotondo, the United States District Court for the Southern District of Florida held the identical arbitration provision valid and enforceable. Rotondo made the same argument that Bennett makes here—that the arbitration provision does not

impose a bilateral obligation to arbitrate. The district court rejected this argument, observing that the provision says that the employee will arbitrate disputes "with" Cisco, not disputes "against" Cisco. The district court was also persuaded by the fact, as are we, that there is nothing in the arbitration

Moreover, the cases Bennett relies on are distinguishable. In *Penn v. Ryan's Family Steak Houses, Inc.*, 269 F.3d 753 (7th Cir.2001), an employer tried to enforce an arbitration agreement as a third-party beneficiary of a contract between its employee and an arbitration company. The court held that the contract was unenforceable because it did not obligate the arbitration company to provide consideration to the employee in return for the employee's agreement to bring any disputes to the arbitration company instead of to a court. Unlike the agreement in *Penn*, which contained no mutuality of obligation between the parties to the contract, *id.* at 760, the agreement here explicitly obligates both parties to the agreement to submit certain claims to arbitration.

In *Gibson v. Neighborhood Health Clinics, Inc.*, 121 F.3d 1126, 1130 (7th Cir. 1997), the plaintiff signed a contract provided by her employer which stated, "I agree to the grievance and arbitration provisions set forth in the Associates Policy Manual" (the Manual). *Id.* at 1128. The Manual, which was not given to Gibson at the time she signed the contract, specifically stated that all disputes, including Title VII claims, were subject to arbitration, but also stated that "it does not constitute a contract or promise of any kind" on the part of the employer. *Id.* at 1128.

Here, unlike *Gibson*, there is no language in the arbitration agreement which states that Cisco is not bound to arbitrate disputes. The court in *Gibson* also found that because the plaintiff was not given a copy of the Manual at the time she signed the contract and never signed the Manual, there was no consideration in the form of a promise by the employer in exchange for the plaintiff's agreement to arbitrate.

Here, it is undisputed that Bennett signed the arbitration agreement and does not argue that there was a lack of consideration.

Finally, in *Ramirez v. Circuit City Stores, Inc.* 12 Cal.App.3d 775, 90 Cal. Rptr. 916 (1970), the arbitration provision stated that the employee agreed to arbitrate any and all employment related disputes with the company. Unlike this case, the arbitration agreement defined "employment related legal disputes" specifically as disputes, claims or controversies *of an employee*. The court also found that the arbitration provision was void for other reasons, including that it limited the employee's ability to proceed in a class action. Moreover, the court later withdrew the case from publication, thereby depriving it of any precedential value it may have had.

Overall, we find no error in the district court's finding that the arbitration provision is valid and enforceable.

### 2.

Bennett also argues that the arbitration provision is invalid because it contains a cost sharing provision. Because the argument was not raised below, this court need not consider it. *See Wiper v. Great Lakes Eng'g Works*, 340 F.2d 727, 731 (6th Cir. 1965). Even assuming that Bennett properly raised this argument, as Cisco points out in a supplemental filing, resolution of this issue is governed by this Court's recent decision in *Morrison v. Circuit City Stores*, 317 F.3d 646 (6th Cir.2003) (en banc), where we rejected the idea that arbitration agreements which contain a cost sharing provision are *per se* invalid. Instead, *Morrison* requires consideration of such factors as the potential litigant's

provision which "reserves [Cisco's] right to avoid arbitration in claims against the employee." *See Rotondo v. Cisco Systems, Inc.*,

no. 00–1755–CIV–MOORE (S.D.Fl. Jan. 31, 2001) (unpublished).

ability to pay, the difference between the expected costs of arbitration (including the costs to other similarly situated employees) and a judicial forum, and whether the difference in costs is so substantial that it would deter bringing claims to arbitration. Because the record is not developed on these points, we decline to address Bennett's arguments in light of *Morrison*.

## C. Defamation

### 1.

As an initial matter, Bennett's argument that the district court applied the wrong law lacks merit. The district court looked to Ohio law in adjudicating Bennett's defamation claim. Although the district court cited Restatement (Second) of Agency and a California penal statute (to show that Bennett's conduct was not only unethical but criminal in some states), Bennett does not argue that the district court applied an incorrect legal standard in granting summary judgment to Cisco.

### 2.

The following background facts are relevant to addressing Bennett's substantive arguments regarding his defamation claim:

Bennett headed Ciscos' sales operation in Florida and other states. Vince Rotondo was one of his sales agents. In April and May 1999, Bennett and Rotondo entered into an agreement with Frank and Omar Valdez in Miami, Florida in which the Valdezes would establish a software company to develop and market telecommunications software compatible with Cisco hardware. The company was established under the name Worldwide Web Systems, Inc. (Worldwide). Bennett met with the Valdezes in Florida as a representative of American Peripherals, Inc. (API), an Ohio corporation that Bennett's wife, Marsa Bennett, formed in 1991 to sell computer equipment. Bennett, through API, invested in Worldwide. API invested $20 for a twenty percent ownership interest in Worldwide. Rotondo made a similar investment though a corporation owed by his wife.

Worldwide then became a Cisco partner. Bennett then encouraged Cisco customers to purchase Cisco hardware and software from Worldwide. One such customer was American MetroComm Corporation (AMC), which entered into contracts with Worldwide totaling $50,000,000. Bennett assisted AMC in obtaining the necessary financing arrangements through Cisco Capital, a unit of Cisco. When Cisco Capital forwarded monies to AMC to fund the contracts, Bennett would go to Miami and meet with the Valdezes and receive checks payable to API, which Bennett would endorse and deposit in API's account in Ohio. Bennett received checks payable to API totaling $2.5 million. Bennett and his wife each received checks from API for $96,000.00 as a "consulting fee."

Frank Valdez filed a lawsuit in December 1999 against Bennett and Rotondo seeking to end the relationship and accusing Bennett and Rotondo of extorting $5,000,000.00 from Worldwide using threats of violence. Bennett denies this and asserts that Worldwide lost AMC's business because it became dissatisfied with Cisco's products; after losing AMC, Worldwide tried to get API to reinvest in Worldwide. When API refused, Worldwide sued API and Bennett.

On April 26, 2000, Cisco sued Worldwide and AMC in federal district court in California, seeking repayment of the loans to AMC made by Cisco Capital. That same day, Cisco filed its demand for arbitration claiming that the payments Bennett received were unlawful and improper.

The next day, two articles appeared in the Wall Street Journal and Reuters News

Service which Bennett says defamed him. The Wall Street Journal article quoted Cisco's CFO, Larry Carter and "two unidentified Cisco officials." The Reuters Article quoted Lorene Avery, a "Cisco spokeswoman." Both articles identified Bennett and Rotondo by name, as well as other Cisco executives. The articles generally reported on the impropriety of Cisco executives having an interest in companies who do business with Cisco. The Reuters article focused on Bennett and Rotondo. Bennett lost his job at a Cisco competitor after the articles were published.

### 3.

#### a.

Ohio law defines libel (written defamation) as "a false and malicious publication made with the intent to injure a person's reputation or expose him to public hatred, contempt, ridicule, shame or disgrace, or to affect him adversely in his trade or profession." *Thomas H. Maloney & Sons, Inc. v. E.W. Scripps Co.,* 43 Ohio App.2d 105, 107, 334 N.E.2d 494 (1974). In order to survive a motion for summary judgment in a libel action, the plaintiff must make a sufficient showing of the existence of every element essential to its case. The essential elements in a libel action are falsity, defamation, publication, injury and fault. *See Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986). There is no cause of action if the imputation is "substantially true." *Natl. Medic Serv. Corp. v. E.W. Scripps Co.,* 61 Ohio App.3d 752, 755, 573 N.E.2d 1148 (1989).

#### b.

■ The district court first determined that Cisco was entitled to summary judgment because Bennett had produced no admissible evidence that the statements in the articles were made by Cisco. The district court relied on Cisco's answer to the complaint where it denied making the alleged defamatory statements. On appeal, Bennett says that the district court erred because "it is unclear whether Cisco denied making the false statements or whether it simply denied that the statements were false and defamatory." Bennett argues that since Cisco's answer simply contains a blanket denial of making the alleged defamatory statements, summary judgment was inappropriate. We disagree. First, Bennett never raised this argument in the district court. Second, it ignores the fact that it was Bennett who had the burden of providing admissible evidence that Cisco made the statements. Bennett failed to do so and the district court was correct in granting Cisco summary judgment on this ground.

#### c.

The district court alternatively found that summary judgment was appropriate because Bennett failed to demonstrate a genuine issue as to the material falsity of any of the alleged defamatory statements. Although the district court noted numerous undisputed facts, Bennett points to only one fact on appeal—he says that the district court erred when it stated that "Bennett admits that he used his position as an operations director for Cisco to cause AMC to purchase millions of dollars worth of hardware and software from Worldwide" and that he "used his position to arrange a sale of Cisco products and associated software through an authorized reseller of Cisco products." Bennett denies making such admissions and says that AMC's then-acting-president "made the decision to purchase products from the Cisco partner (Worldwide) not Bennett."

Cisco says that Bennett's contention is misleading and there is no genuine issue of material fact that Bennett obtained the

AMC contract for Worldwide. We agree. The "then-acting-president" of AMC that Bennett refers to is Peter Sahagen. Sahagen's decision was short-lived. He was soon replaced as president of AMC by Michael Henry, who cancelled the Worldwide contract. However, when Henry made the decision to place the new AMC contract with Worldwide, he stated in an affidavit that he would not have made that decision but for Bennett and Rotondo. Bennett admitted at deposition that Sahagen's decision was a "moot point" because the order was canceled and replaced with a new order approved by Henry. Bennett also testified at deposition that he did not believe that Worldwide would have gotten the contract with AMC without his involvement. Bennett's wife and Rotondo also made similar statements. Thus, because Bennett has not presented more than a scintilla of evidence to the contrary, we find no error in the district court's factual finding regarding Bennett's use of his position at Cisco's expense.

Additionally, in determining that there was no genuine issue as to whether the statements in the newspapers were materially false, the district court carefully analyzed the evidence in detail and found that Bennett's actions were in violation of Cisco's policies and were in fact unethical and improper and concluded that Bennett's defamation claim failed because the alleged defamatory statements were not materially false. We find no error in the district court's conclusion, which Bennett, with the one exception discussed above that we have rejected, does not challenge on appeal. We rely on the district court's reasoning and also conclude that there is no genuine issue that the alleged defamatory statements were not materially false and therefore Cisco was entitled to summary judgment. In any event, we have already determined above that summary judgment was proper because Bennett failed to produce admissible evidence that Cisco made the allegedly defamatory statements.

## III. CONCLUSION

For the reasons stated above, we AFFIRM the judgments of the district court.