The GENERAL CONFERENCE OF the EVANGELICAL METHODIST CHURCH, Plaintiff,

v.

EVANGELICAL METHODIST CHURCH OF DALTON, GEORGIA, INC., Defendant.

Civil Action File No. 4:11–CV–0186–HLM.

United States District Court, N.D. Georgia, Rome Division.

Aug. 22, 2011.

**1292**

Jane Dall Wilson, Scott D. Himsel, Baker & Daniels, Indianapolis, IN, John Matthew Hawkins, Robert Maddox Brinson, Brinson Askew Berry Siegler Richardson & Davis, LLP, Rome, GA, for Plaintiff.

Gregory Harold Kinnamon, Gregory H. Kinnamon, P.C., Dalton, GA, for Defendant.

*ORDER*

HAROLD L. MURPHY, District Judge.

This is a Complaint seeking an Order to compel arbitration. The case is before the Court on Plaintiff's Motion to Compel Arbitration [3].

## I. Background

### A. Factual Background

#### 1. The Parties

Plaintiff is a not-for-profit Indiana corporation with its principal place of business in Indiana. (Compl. ¶ 1.) Defendant is a not-for-profit Georgia corporation with its principal place of business in Dalton, Georgia. (*Id.* ¶ 2.)

#### 2. The Parties' Relationship

On February 13, 1955, Defendant's predecessor, the Evangelical Methodist Church of Dalton, signed an Affiliation Resolution with Plaintiff, in which Defendant accepted "that collection of rules and procedure and organization entitled, *Discipline of the Evangelical Methodist Church,* which shall be called the *Discipline* " (Compl. ¶ 6; Mot. Compel Arb. Ex. A–1.) On May 17, 1988, Defendant became an entity registered with the Georgia Secretary of State as the Evangelical Methodist Church of Dalton, Georgia, Inc. (Compl. ¶ 7.) Defendant owns property located at 1035 Abutment Rd., Dalton, Georgia, and a church with capacity to seat approximately 300 people in the sanctuary that is located on the property. (*Id.* ¶ 8.)

The *Discipline of the Evangelical Methodist Church* (the "Discipline") provides only two means for a local church to depart from, and to remove property from, the Evangelical Methodist Church ("EMC") denomination: (1) the EMC's General Council disaffiliates the local church under § 609 of the Discipline; or (2) the local church withdraws from the EMC under § 209 of the Discipline. (Compl. ¶ 9.) Plaintiff has not disaffiliated Defendant under § 609 of the Discipline. (*Id.* ¶ 12.)

Section 209 of the Discipline provides:

> In the event that a local church desires to vote on the question of withdrawal from the [EMC], the local church must follow the procedure set out below;
>
> (1) **Four weeks prior to vote.** If a withdrawal vote is to be taken, the Conference Superintendent must be notified in writing by the Pastor and/or the Chairman of the Board of

Stewards at least four (4) weeks prior to the Annual Church Conference that the matter of withdrawal will be considered at the annual church conference. The Conference Superintendent must preside at the taking of any vote on the subject of (a) the local church's withdrawal from the denomination and/or (b) the local church's conveying, selling, exchanging, or encumbering of property in connection with, or in any way related to, a withdrawal.

(2) **Two weeks prior to vote.** At least two (2) weeks in advance of the withdrawal vote, the Conference Superintendent must certify in writing to the General Superintendent, with a copy to the local church, that the local church has paid its conference support to date and repaid to the denomination all monies disbursed to that local church by the denomination (the "Disbursed Funds"). The Disbursed Funds include, but are not limited to[,] grants, loans, and monies disbursed to that local church by the denomination for any and all purposes, including amounts paid directly to the pastor as salary, No withdrawal vote may be taken unless the local church has received this written certification two (2) weeks prior to the vote.

(3) **The initial vote.** A withdrawal vote can be taken only at the time of the Annual Church Conference. The motion to withdraw requires a favorable vote of three-fourths of the eligible church membership present and voting for passage. If an initial withdrawal motion receives a three-fourths vote, the pastor and any lay persons in the local church who hold offices in the General Conference shall be deemed to have resigned those positions.

(4) **The one-year waiting period.** If the motion to withdraw receives the necessary three-fourths vote, there shall be a waiting period of one year (the "waiting period").

(5) **The second vote.** At the end of the waiting period, a second vote on the motion to withdraw must be taken. If the motion to withdraw again receives the necessary three-fourths vote, the withdrawal shall be effective immediately. The pastor shall surrender his/her credentials or resign as pastor of the church, effective the day of the final vote.

(6) **Sixty day notice of transactions.** No property belonging to a local church may be conveyed, sold, exchanged, or encumbered unless the local church provides written notice at least sixty (60) days in advance of the proposed transaction to the Conference Superintendent. The written notice must (a) explain the purpose of the planned transaction; (b) state the nature and the address of the person or entity to whom or to which the local church proposes to convey, sell, exchange, or encumber property; (c) list the entity's trustees and officers; and (d) state the impact of the proposed transaction upon any current member's ability to attend church (and if there is any such impact, what provision the local church will make to meet that need).

(7) **No property transaction until after certification of second vote.** The local church may not transfer, sell, exchange or encumber property in connection with, or in any way related to[,] a withdrawal from the [EMC] unless the Conference Superintendent has certified in writing to the General Superintendent, with a copy to the local church, that the

local church has paid its conference support to date and has completed each step of the procedure outlined in ¶ 209, including but not limited to a vote of three-quarters of the members present and eligible to vote in favor of withdrawal during two consecutive annual church conferences that were presided over by the Conference Superintendent. In addition, any document that transfers, sells, exchanges or encumbers property in connection with, or in any way related to, a withdrawal must be countersigned by the Conference Superintendent in order to be valid. (Mot. Compel Ex. A–2 at 1.) Section 701 of the Discipline governs conflict mediation, and states:

*Principles.* The Bible provides that believers should resolve disputes among themselves or within the Church whenever possible (Matthew 18:15–20; I Corinthians 6:1–8). The Bible also provides that believers are subject to and should obey the governing authorities, which include the courts of law (Romans 13:1–5).

*Resolving Disputes.* The [EMC], its districts and congregations (collectively, the "Parties," individually, "party"), agree that they will attempt to resolve all non-doctrinal disputes among themselves without resort to the courts. A non-doctrinal dispute is a dispute within the [EMC] that a civil court would otherwise decide and, therefore, does not include matters of church doctrine. For example, all disputes between the Parties concerning real and personal property, including all property questions arising out of or related to the withdrawal of a congregation from the [EMC], are non-doctrinal disputes. The Parties agree to abide by the requirements of the *Discipline* regarding withdrawal and other non-doctrinal disputes. This Chapter does not govern disputes

regarding a minister's or member's alleged violation of church doctrine, including those matters discussed in Paragraphs 901–961 of the *Discipline.*

*Conciliation, Mediation, and Arbitration.* If the Parties are unable to resolve a future non-doctrinal dispute among themselves, they shall resolve that dispute by means of Christian conciliation, mediation, or arbitration. Any party to the dispute (or the General Superintendent of the [EMC], if he or she is not already a party to the dispute) may initiate that process by a written request to the Secretary of the [EMC], who shall process all such requests. The written request shall state the issues, the amount of money involved, and the remedies sought. If the Parties do not resolve their dispute through conciliation or mediation, they agree to proceed to legally binding arbitration; the arbitrator may impose any remedy available in law or equity. Conciliation, mediation, and arbitration shall be conducted in accordance with the then current rules of the Institute of Christian Conciliation (ICC), a division of Peacemaker Ministries. Whenever possible, the Parties will use ICC-trained [EMC] personnel as conciliators, mediators, and arbitrators. The General Superintendent may designate a dispute resolution provider or trainer other than ICC in his or her sole discretion if the ICC is no longer in existence or is no longer providing appropriate dispute resolution service or training.

*Sole Process: Waiver of Civil Legal Action.* Resolution by the Parties themselves or through Christian conciliation, mediation and legally binding arbitration are the sole means by which non-doctrinal disputes may be resolved. Therefore, the [P]arties waive any rights they *may* have to resolve a non-doctrinal dispute by filing a lawsuit in a civil

court, except that a party *may* file suit in a civil court if necessary [i] to enforce another party's obligation to participate in a dispute resolution process provided in the foregoing conciliation clause, [ii] to enforce an award made during that dispute resolution process, or [iii] to take any other action permitted under the rules of the dispute resolution provider. A party may institute such a civil action in any court having jurisdiction over the Parties.

*Additional Matters.* These provisions will be interpreted in accordance with Indiana law.

(*Id.* at 2 (emphasis in original).)

Section 211 of the Discipline states: "In the event a local church is dissolved, the local church shall transfer to the trustees of the district in which the church is located the title to all church property, subject to prior claims and lien holders. In disposing the [sic] property, any written recommendation(s) of the congregation may be considered." (Def.'s Resp. Mot. Compel Arb. Ex. A at 3.) Finally, Section 206 of the Discipline provides:

> The church treasurer and pastor shall check to see that all Conference Support has been paid at the end of the fiscal year and shall report the same to the Annual Church Conference, If there is a shortage of Conference Support payments, the church shall have until thirty days before the District Conference to make up the deficit. If the deficit is not made up in this time, the church will not be allowed to seat delegates at the General and District Conferences, except upon recommendation of the District Superintendent and upon two-thirds vote of the conference.

(*Id.* at 2.)[1]

On August 8, 2010, nine of Defendant's members, each signing as Steward or Trustee, individually, executed a warranty deed that purported to transfer Defendant's church property from Defendant to "Church on the Hill, Inc." (Compl. ¶ 16.) The Conference Superintendent did not countersign the deed, and did not certify in writing to the General Counsel that Defendant had paid its conference support to date and completed each step of the procedure set forth in § 209. (*Id.* ¶ 17.)

On August 16, 2010, an attorney sent a letter on behalf of certain members of Defendant, who claimed to have terminated Defendant's relationship with Plaintiff. (Compl. ¶ 11; Mot. Compel Ex. A–3.) That letter stated, in relevant part:

> Please be advised that the undersigned and this law firm represents [Defendant]. I have been privy to your various letters to my client. As you are aware, my client, in accordance with your Discipline[,] previously tendered its notice of intent to withdraw from EMC International. Furthermore, due to the recent climate of our communication with you, we brought the same before the congregation on August 8, 2010 for the final vote.
>
> This letter is to advise you that the congregation passed the matter overwhelmingly. Thus, any and all ties to your organization are hereby severed.
>
> I'm certain that you will not want to interfere with the orderly transition to accomplish this objective, as it is obviously the will of the Board of Stewards,

---

1. Defendant contends that it or the District paid Defendant's conference support due after 2007, and that the District Superintendent forgave Defendant's conference support that was in arrears for 2006 and 2007. (Aff. of Sandy Howard Ex. A at 1–2.) Further, Defendant argues that it had delegates seated at all District or General Conferences that occurred since September 2006. (*Id.* at 2–3.)

the congregation and the result of many prayers on their behalf asking for divine guidance.

Please govern yourselves accordingly. (Mot. Compel Ex. A–3.)

Plaintiff contends that Defendant failed to take two withdrawal votes separated by a year, with proper notices and with a superintendent providing over both votes, as required by the Discipline. (Compl. ¶ 11.) Plaintiff also alleges that Defendant failed to pay conference support exceeding $90,000 before taking either of the purported withdrawal votes. (*Id.*) Plaintiff consequently contends that Defendant's church property should be available for EMC worship. (*Id.* ¶ 14.) Further, Plaintiff contends that Defendant's purported transfer of its property is invalid, (*Id.* ¶ 17.) Defendant's representatives, however, allege that Defendant correctly followed the withdrawal procedure, including taking the appropriate initial vote required by § 209 and repaying all conference support, and argue that Plaintiff refused to cooperate with Defendant to schedule a second vote. (Aff. of Dewey Fleming ¶¶ 4–11 & Ex. A; Aff. of Mike Shoates Ex. A; Aff. of Sandy Howard ¶ 3 & Exs. A–B; Aff. of Harry Lawrence Ex. A.)

After Plaintiff received the August 16, 2010 letter from Defendant's attorney, Plaintiff wrote a letter to Defendant's Board of Stewards that stated:

> We are in receipt of your lawyer's letter stating your vote of August 8, 2010 to withdraw from the denomination. We need to inform you such a vote violated the *Discipline* of the [EMC] in many particulars and therefore is invalid. Let me remind you that every church signs an Affiliation Resolution, (¶ 204 of the *Discipline* )[,] which states they will honor their denominational connection and abide by the rules that govern such (ie; The *Discipline* ). That alone is a matter of integrity.
>
> In order to disaffiliate with the denomination, a local church must conclude from section "Miscellaneous Items for the Local Church" of the Handbook, item IX, 1 that the EMC has "turned from its evangelical conservative doctrine and theological position by adopting liberal theology." That has not happened. This alone is the justification for using the process in paragraph 209.
>
> There is a huge difference between what is permitted and what you have attempted. It is more than likely that your desire to disengage with the EMC is based [more] on "personality conflicts" and "Conference decisions" than on theology, and such things do not permit a vote to withdraw.
>
> It should be further noted from your lawyer's letter that though the first (illegal) vote was taken in December of 2009, according to the *Discipline*, you could not have taken a second vote until one year expires. Apparently the recent vote was calculated to avoid denominational representation.
>
> Therefore, in accordance with the *Discipline*, neither your first nor second votes are valid. That being said, we do want you to know that we are interested in you as a body of believers. The question we have is why did you not want a representative in your church to field any questions you might have had? That would have been the biblical route to take and may have answered any and all misinformation you have been receiving.
>
> We intend to be present to answer your concerns as they no doubt have caused you to assume an action that is contrary to the *Discipline*. It also reflects disrespect for handling disputes in a biblical manner. We believe you would be better served to find out all you can about what is taking place around you.

If you do not want to engage in such dialogue you must realize (see ¶ 701 of the *Discipline*) that all levels of the EMC opted some time ago to utilize The Institute of Christian Conciliation, a division of Peacemaker Ministries.

You would be better served by your attorney if he were aware of the mandatory nature of ¶ 701 of the *Discipline*. While we would rather not go this route we will do so if a local church deliberately chooses not to follow the *Discipline* or engage in mature dialogue.

It is our desire to not just hear from you but hear you out. Will you show the same courtesy to your denominational leadership and representatives?

(Mot. Compel Ex. A–4 at 1–2.) Defendant did not reply to that letter. (Compl. ¶ 18.)

On October 13, 2010, the Conference Superintendents sent a letter to Defendant invoking the alternative dispute resolution provisions of § 701 of the Discipline. (Compl. ¶ 19; Mot. Compel Ex. A–5.) That letter provided, in relevant part:

EMC International Headquarters received an August 16, 2010, letter from Attorney Gregory Kinnamon claiming that Dalton EMC Church (the "Church") had withdrawn from the Evangelical Methodist Church (the "EMC"). This purported withdrawal of the Church from being a place of EMC worship is invalid for a number of reasons.

First, the Church failed to repay funds disbursed to it or on its behalf before taking purported withdrawal votes, ¶ 209 of the Discipline of the Evangelical Methodist Church (the "Discipline") states that no withdrawal vote can be taken unless and until "*the local church has paid its conference support to date and repaid to the denomination all monies disbursed to that local church by the denomination* (the "Disbursed Funds"). The Disbursed Funds include,

but are not limited to grants, loans, and monies disbursed to that local church by the denomination for *any and all* purposes ....") (emphases added). The Church failed to pay conference support exceeding $30,000 prior to taking either of the purported withdrawal votes. The former Southern District's effort to eliminate this Discipline requirement by seeking to pay the Church's obligations fails, ¶ 209 expressly requires "the local church" to pay its own support and provides no means for a District to pay a local church's support. To the contrary, ¶ 209 requires that monies disbursed "for any and all purposes" be repaid before a withdrawal vote can occur; this would include District monies purportedly disbursed on behalf of a local church.

Second, there was no basis to withdraw at the time of either of the Church's purported withdrawal votes. The EMC General Conference, the denomination's highest law making body, has provided in the Handbook of the Evangelical Methodist Church that the purpose of ¶ 209 of the Discipline is to protect local churches and their property ownership in the event the EMC "turns away from its evangelical conservative doctrine and theological position by adopting liberal theology." The EMC has not adopted liberal theology.

Third, even if the Church had taken a valid first withdrawal vote in December 2009 (and it did not), ¶ 209 does not permit a second withdrawal vote until one year later (December 2010). Thus, a second vote in August 2010 could not withdraw the Church from the EMC in any event.

Fourth, the Church failed to meet other requirements for a second vote in August 2010. ¶ 209 requires that a Superintendent be notified four weeks in advance of any withdrawal vote; that the

Superintendent preside at the taking of any withdrawal vote; and that a withdrawal vote must occur at a regularly called annual church conference. The Church did not fulfill any of these requirements in connection with its purported August 2010 vote. The EMC Superintendents received no notice that the Church would take a withdrawal vote, The Superintendent did not preside at the taking of the vote. Indeed, the Superintendent was not even present given the lack of notice. Nor did the vote occur at a regularly called annual conference. The Church may have also failed to comply with some of these requirements in connection with its first purported withdrawal vote.

In ¶ 701 of the Discipline, the EMC, its districts and congregations agree that they will attempt to resolve "all disputes between the Parties concerning real and personal property, including all property questions arising out of or related to the withdrawal of a congregation from the EMC ...." within the EMC. Accordingly, after the purported second vote, the Rev. Ike Cowell, an EMC Superintendent, attempted without success to persuade the Church to comply with its obligations to the EMC. ¶ 701 of the Discipline provides that if the parties are unable to resolve such disputes among themselves, "they shall resolve the dispute by means of Christian conciliation, mediation or arbitration" conducted by "the Institute of Christian Conciliation (ICC), a division of Peacemaker Ministries." The Christian Conciliation process may be invoked by a written request to the General Secretary Treasurer of the EMC. This letter is also addressed to the General Secretary Treasurer and should be considered such a written request.

The Church should be advised that ignoring this letter will not resolve this matter. ¶ 701 also permits the EMC to obtain a court order enforcing the Church's obligation under the Discipline to participate in Christian Conciliation. Unless the undersigned receives confirmation that the Church will participate in conciliation within fifteen (15) days of the date of this letter, the EMC will initiate legal action to require the Church to participate in Christian Conciliation.

(Mot. Compel Arb. Ex. A–5 at 1–2 (emphasis in original).) Defendant did not respond to that request. (Compl. ¶ 22.)

**B. Procedural Background**

On July 8, 2011, Plaintiff filed this lawsuit. (Docket Entry No. 1.) Plaintiff seeks an Order compelling Defendant to submit to arbitration. (Compl. ¶ 26 (stating that Plaintiff "seeks no relief from this Court other than an order compelling arbitration").)

On that same day, Plaintiff filed its Motion to Compel Arbitration. (Docket Entry No. 3.) The briefing process for that Motion is complete, and the Court consequently finds that this matter is ripe for resolution by the Court.

**II. Discussion**

The Federal Arbitration Act, 9 U.S.C.A. § 1, *et seq.*, ("FAA") generally governs a motion to compel arbitration. 9 U.S.C.A. § 2 provides:

A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save

upon such grounds as exist at law or in equity for the revocation of any contract. 9 U.S.C.A. § 2.

 Courts must conduct a two-step inquiry when determining whether to compel arbitration. *Klay v. All Defendants,* 389 F.3d 1191, 1200 (11th Cir.2004). First, the Court must determine whether the parties agreed to arbitrate the dispute. *Id.* The Court must make that determination " 'by applying the federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the [FAA].' " *Id.* (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)) (alteration in original). The Court also must undertake that inquiry "against the background of a liberal federal policy favoring arbitration agreements.' " *Id.* (quoting *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)). The United States Court of Appeals for the Eleventh Circuit, however, has cautioned that "[w]hile there is a liberal federal policy favoring arbitration agreements, 'the FAA's strong proarbitration policy only applies to disputes that the parties have agreed to arbitrate.' " *Becker v. Davis,* 491 F.3d 1292, 1298 (11th Cir. 2007) (quoting *Klay,* 389 F.3d at 1200). Consequently, "[a] party cannot be forced to arbitrate any dispute that the party has not agreed to submit to arbitration." *Id.*

 The FAA generally governs the validity of an arbitration agreement; however, state law generally governs whether an enforceable contract or agreement to arbitrate exists. *Caley v. Gulfstream Aerospace Corp.,* 428 F.3d 1359, 1368 (11th Cir.2005); *Honig v. Comcast of Ga. I, LLC,* 537 F.Supp.2d 1277, 1283 (N.D.Ga. 2008). "Thus, in determining whether a binding agreement arose between the parties, courts apply the contract law of the particular state that governs the formation of contracts." *Caley,* 428 F.3d at 1368. "[A] court can decline to enforce an arbitration agreement under the FAA only if the [party opposing arbitration] can point to a generally applicable principle of contract law under which the agreement could be revoked." *Id.* at 1371. "If all the provisions of the arbitration clause are enforceable, then the court must compel arbitration according to the terms of the agreement." *Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship,* 432 F.3d 1327, 1331 (11th Cir.2005).

 By executing the Affiliation Resolution, Defendant agreed to accept the Discipline. (Mot. Compel Arb. Ex. A–1.) Section 701 of the Discipline contains a conflict resolution provision, which governs non-doctrinal disputes. (*Id.* Ex. A–2 at 2.) Under § 701, a non-doctrinal dispute "is a dispute within the Evangelical Methodist Church that a civil court could otherwise decide and, therefore, does not include matters of church doctrine." (*Id.*) Section 701 expressly states that "all disputes between the Parties concerning real and personal property, including all property questions arising out of or related to the withdrawal of a congregation from the Evangelical Methodist Church, are non-doctrinal disputes." (*Id.*) The underlying dispute in this case is a non-doctrinal dispute because it is a property dispute arising from, or related to, Defendant's withdrawal from Plaintiff.[2] Consequently, the underlying dispute in this case ordinarily would be subject to the conflict resolution provision of § 701.

---

**2.** In reaching this conclusion, the Court makes no determination concerning the merits of Defendant's attempted withdrawal or its attempted withdrawal or the validity of Defendant's attempt to transfer property.

Section 701's conflict resolution provision contains an arbitration clause that states:

> *Conciliation, Mediation, and Arbitration.* If the Parties are unable to resolve a future non-doctrinal dispute among themselves, they shall resolve that dispute by means of Christian conciliation, mediation, or arbitration. Any party to the dispute (or the General Superintendent of the [EMC], if he or she is not already a party to the dispute) may initiate that process by a written request to the Secretary of the [EMC], who shall process all such requests. The written request shall state the issues, the amount of money involved, and the remedies sought. If the Parties do not resolve their dispute through conciliation or mediation, they agree to proceed to legally binding arbitration; the arbitrator may impose any remedy available in law or equity. Conciliation, mediation, and arbitration shall be conducted in accordance with the then current rules of the Institute of Christian Conciliation (ICC), a division of Peacemaker Ministries. Whenever possible, the Parties will use ICC-trained [EMC] personnel as conciliators, mediators, and arbitrators. The General Superintendent may designate a dispute resolution provider or trainer other than ICC in his or her sole discretion if the ICC is no longer in existence or is no longer providing appropriate dispute resolution service or training.
>
> *Sole Process: Waiver of Civil Legal Action.* Resolution by the Parties themselves or through Christian conciliation, mediation and legally binding arbitration are the sole means by which non-doctrinal disputes may be resolved. Therefore, the [P]arties waive any rights they *may* have to resolve a non-doctrinal dispute by filing a lawsuit in a civil court, except that a party *may* file suit in a civil court if necessary [i] to enforce another party's obligation to participate in a dispute resolution process provided in the foregoing conciliation clause, [ii] to enforce an award made during that dispute resolution process, or [iii] to take any other action permitted under the rules of the dispute resolution provider. A party may institute such a civil action in *any* court having jurisdiction over the Parties.

(Mot. Compel Arb. Ex. A–2 at 2.) Section 701's conflict resolution provision thus includes an arbitration provision, Because Defendant agreed to be bound by the provisions of the Discipline, Defendant also agreed to be bound by § 701's arbitration provision. The Court consequently finds that an agreement to arbitrate exists in this case.[3]

■ "The second step in ruling on a motion to compel arbitration involves deciding whether 'legal constraints external to the parties' agreement foreclosed arbitration.'" *Klay*, 389 F.3d at 1200 (quoting *Mitsubishi Motors Corp.*, 473 U.S. at 628, 105 S.Ct. 3346). The Court cannot determine that any such legal constraints exist here. First, the terms of the arbitration provision are not vague and ambiguous.

---

**3.** That agreement would be enforceable under either Georgia or Indiana law. O.C.G.A, § 9–9–3 ("A written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit any controversy thereafter arising to arbitration is enforceable without regard to the justicable character of the controversy and confers jurisdiction on the courts of the state to enforce it and to enter judgment on an award."); Ind.Code § 34–57–2–1(a) ("A written agreement to submit to arbitration is valid, and enforceable, an existing controversy or a controversy thereafter arising is valid and enforceable, except upon such grounds as exist at law or in equity for the revocation of any contract.").

*See Easterly v. Heritage Christian Sch.,* No. 1:08–cv–1714–WTL–TAB, 2009 WL 2750099, at *2–3 (S.D.Ind. Aug. 26, 2009) (examining similar arbitration provision and concluding that provision was not vague and ambiguous). Second, although Defendant apparently contends that the arbitration process will not be impartial, this concern does not invalidate the arbitration provision, particularly where Defendant has failed to point to any specific prejudice that it would suffer under § 701's arbitration provision. *See Jenkins v. Trinity Evangelical Lutheran Church,* 356 Ill.App.3d 504, 292 Ill.Dec. 195, 825 N.E.2d 1206, 1214 (2005) (rejecting partiality argument where plaintiff failed to point to any specific prejudice he would suffer under church bylaws, but instead simply expressed generalized fear of partiality); *see also Easterly,* 2009 WL 2750099, at *3 ("The Supreme Court has repeatedly counseled that the FAA leaves no room for judicial hostility to arbitration proceedings and that courts should not presume, absent concrete proof to the contrary, that arbitration systems will be unfair or biased.") (quoting *Penn v. Ryan's Family Steak Houses, Inc.,* 269 F.3d 753, 758 (7th Cir.2001)). Consequently, the Court cannot find that legal constraints external to the parties' agreement foreclose arbitration.

For the reasons discussed above, the Court concludes that the parties entered into a valid, enforceable agreement to arbitrate the underlying dispute. The Court therefore grants Plaintiff's Motion to Compel Arbitration.

## III. Conclusion

ACCORDINGLY, the Court **GRANTS** Plaintiff's Motion to Compel Arbitration

**4.** Plaintiff's Complaint seeks only an Order directing Defendant to participate in the dispute resolution process as provided in Section 701 of the Discipline. Because the Court has

[3]. The Court **ORDERS** the parties to submit the underlying dispute to arbitration, as provided in Section 701 of the Discipline, and **DIRECTS** Defendant to participate in that dispute resolution process. The Court DIRECTS the Clerk to CLOSE this action.[4]

granted all the relief sought by Plaintiff, the Court finds that closing this case is appropriate.